ELIZABETH EMMERICH, Appellant, *v.* JENNIE E. THORLEY and
CHARLES THORLEY, Respondents.

*Insane person — confinement of, without judicial warrant — liability therefor —
effect of a physician's certificate and its approval — in the case .of a non-resident
section 1 of chapter 446 of 1874 is not applicable.*

A private person who, of his own motion and without judicial warrant or pro-
cess, interferes with the liberty of an alleged lunatic, must take the responsi-
bility of his errors of judgment. But where the facts show that such restraint
was demanded by a real necessity for the care and safety of the individual
restrained, or for the protection of others, no actionable trespass is committed.

In an action to recover damages for false imprisonment it appeared that the plain-
tiff, a resident of the State of New Jersey, came, uninvited, to the house of
the defendants, her sister and brother-in-law, in the city of New York, suffer-
ing from a delusion that persons were concealed in her room and under her bed,
and that she was followed by a woman (who was not in fact in the house), and
that she made attempts to escape from her fancied pursuers by throwing herself
from a window; that, acting on the advice of a physician, and in consequence
of what they had observed, the defendants, after making an unsuccessful
attempt to place the plaintiff in an asylum of the city of New York, took the
plaintiff in their private carriage to the Bloomingdale asylum at White Plains;
that there, in pursuance of chapter 446 of the Laws of 1874, the plaintiff was
examined by two physicians, examiners in lunacy not connected with the asy-
lum, and upon the depositions of those physicians, stating that they believed
the plaintiff to be insane (but not in terms that she was actually dangerous
at the very hour that she was examined at White Plains), a justice of the
Supreme Court approved the certificate under which she was detained in the
asylum for two or three weeks, at the end of which time she was released.

*Held*, that the complaint was properly dismissed; that the certificate of the exam-
iners in lunacy and the approval of the justice of the Supreme Court protected
the defendants;

That the fact that section 1 of chapter 446 of the Laws of 1874 required the cer-
tificate to be approved by a judge of the county or judicial district in which
the alleged lunatic resided, did not deprive the justice of the Supreme Court,
who approved the certificate under which the plaintiff was detained, of juris-
diction, as that provision only relates to residents of the State of New York.

VAN BRUNT, P. J., dissented.

APPEAL by the plaintiff, Elizabeth Emmerich, from a judgment
of the Supreme Court in favor of the defendants, entered in the
office of the clerk of the county of New York on the 24th day of
March, 1898, upon the dismissal of the complaint by direction of
the court after a trial at the New York Trial Term, and also from

an order entered in said clerk's office on the 20th day of April, 1898, denying the plaintiff's motion for a new trial made upon the minutes.

*James M. Hunt,* for the appellant.

*Joseph Fettretch,* for the respondents.

PATTERSON, J.:

This action was brought to recover damages for false imprisonment. On the trial a nonsuit was directed, and from the judgment entered thereon the plaintiff appeals. We are to inquire whether, upon the whole case, there was anything to go to the jury. The trial judge expressed a doubt as to the case being one for nominal damages or for a dismissal of the complaint, but adopted the latter view, which, we think, upon all the facts established, was the proper one. The gravamen of an action for false imprisonment is an unlawful arrest and detention. The plaintiff was restrained of her liberty by the defendants, who are her sister and her brother-in-law, and they procured her commitment to an insane asylum. To justify their conduct and relieve them from legal responsibility, they were obliged to show that such circumstances existed as authorized them to apply restraint and institute proceedings for the commitment. Unless the record shows such circumstances, without any conflict of evidence, requiring the submission of disputed facts to a jury, the judgment cannot be sustained.

It was proven that on the 9th of December, 1895, at about six o'clock in the evening, the plaintiff, accompanied by her young daughter and a clergyman, appeared at the defendants' house in the city of New York. Some conversation was had between the clergyman and the defendant, Mrs. Thorley, concerning the plaintiff's condition. The clergyman was the pastor of a church in New Jersey, and the plaintiff, who resided in that State, was a member of his congregation. Previously, and on the seventh of December, the defendants had received a telegram sent from New Jersey by a physician, notifying them that the plaintiff was sick. After the plaintiff arrived at the defendants' house on the night of the ninth of December, a telegram was received by Mrs. Thorley, signed "J.

P. Henry, M. D." It was sent from New Jersey, and was in the following words, viz.: "Mrs. Emmerich has been acting insanely. You must take charge of her, and see that she is kept perfectly quiet. Should she return here in same condition, it would be necessary to arrest and confine her."

Those were the circumstances under which the plaintiff obtained shelter and protection in the defendants' house. She came to it without their invitation or suggestion, and they were ignorant before her arrival of her intention to visit them or of the purpose of any one to bring her to them. She was a widow, or a divorcee. She was received by the defendants and provision was made for her entertainment for the night. After retiring for a while to her room she left it in her nightdress, exhibiting signs of great fear or terror. She declared that there were persons concealed in her room and under her bed; that she was followed by a woman (who was not in the house), and showed unmistakably that she was laboring under delusions of persecution. During that night she made attempts to escape from her fancied pursuers by throwing herself from a window. It was only by the exertion of force by Mr. Thorley that she was overcome, and she was not quieted until her strength was exhausted. The testimony as to delusions of the plaintiff and her violent conduct comes from the defendants principally, but it is not denied by the plaintiff. Her testimony, carefully examined, only goes to the extent of declaring that she does not remember such occurrences as those sworn to by the defendants. It may be claimed that, as the evidence of the plaintiff's conduct comes from interested parties, their credibility should have been submitted to the jury. Such is undoubtedly the general rule ( *Williams* v. *D., L. & W. R. R. Co.*, 155 N. Y. 158), but where there is corroboration of interested parties and no real conflict, the action of the court may be based on their testimony. (*Anderson* v. *Boyer*, 156 N. Y. 97.) In this case there was corroboration. It is contained in the testimony of Dr. Reid, who was called in by the defendants on the evening of the ninth. He was not a stranger to the plaintiff, but had frequently treated her as her physician. He observed on the night of the ninth the hallucinations of the plaintiff and her frenzied condition. Among other exhibitions of wildness he saw her go to the sick bed of the elder Mrs. Thorley, heard her declare that lady to be the

woman who was pursuing her, and saw her approach the bed as if to do bodily harm to its occupant.

On this state of the evidence no other conclusion could be reached than that it was established that on the night of the 9th of December, 1895, this plaintiff was suffering from mental disburbance to the point of irresponsibility and that she was a dangerous person, liable to commit acts tending to injure herself, in her efforts to escape from fancied pursuers, and that in her condition danger might result to others from her insane promptings, were she not put under proper and reasonable restraint. Acting on the advice of Dr. Reid, and in consequence of what they had observed, the defendants determined to take the proceedings provided by law for placing the plaintiff in an asylum for care and treatment. They made attempts to find accommodations for her in such an institution in the city of New York, but were unsuccessful in their efforts. On the tenth of December they took the plaintiff in their own private carriage to the Bloomingdale Asylum, at White Plains, where she was examined by two physicians, examiners in lunacy not connected with the asylum, and upon the depositions of those physicians a justice of the Supreme Court approved the certificate under which she was detained in the asylum, where she remained for two or three weeks and was then released.

The acts of the defendants connected with the restraint and detention of the plaintiff are claimed by her counsel to be unlawful in two respects: *First*, in the conveyance of the plaintiff from the city of New York to the asylum at White Plains. *Second*, in instigating or procuring the so-called commitment of the plaintiff at White Plains. As to the first branch of the inquiry, the question is plainly presented of the legal responsibility of a private person, acting of his own motion and without judicial warrant or process, for interfering with the liberty of another on an allegation of insanity. In such cases there is no justification for interference or restraint unless it is demanded by a real necessity for the care and safety of an individual dangerous to himself or for the protection of others, to whom he is or may be dangerous. Whoever, merely as a private person, applies such restraint must act upon facts and not upon suspicion or belief. He may have to take the responsibility of his errors of judgment. But where the facts show the

danger and the necessity no actionable trespass has been committed, and such has always been the law in England and in this country. In Addison on Torts (Vol. 2, 28, par. 819) it is said : " A private person may, without any warrant or authority, confine a person disordered in his mind who seems disposed to do mischief to himself or to any other person, *the restraint being necessary* both for the safety of the lunatic and the preservation of the public peace." In *Fletcher* v. *Fletcher* (28 L. J. Rep. [Q. B.] 136), Lord CAMPBELL, Ch. J., says : " By the common law of England it is only a person of unsound mind and dangerous to himself or others that may be restrained of his liberty by another : such is taken to be law from the case in *Bro Abr.* (title *Faux Imprisonment*) down to the last case on the subject," and WIGHTMAN, J., in the same case, says : " At common law any one taking up another as a lunatic in order to justify himself must shew he *was* a dangerous lunatic." Lord TENTERDEN, Ch. J., in *Anderdon* v. *Burrows* (4 Car. & P. 210), states the rule to be that restraint of a lunatic is unauthorized unless necessary to prevent the party from doing some immediate injury either to himself or others. Of the American cases *Look* v. *Dean* (108 Mass. 116) is generally to the same point. *Keleher* v. *Putnam* (60 N. H. 30) decides that, at common law, a person's insanity justifies his arrest without legal process in a case of reasonable necessity, by which is meant, doubtless, the dangerous condition of the lunatic. But the most useful and instructive of the American cases is *Colby* v. *Jackson* (12 N. H. 529). It was decided in 1842, and may be considered the leading one on the subject. The following extracts from the opinion of the court, by GILCHRIST, J., are pertinent to the case before us : " But it is well settled at common law that a private person, without warrant, may lawfully seize and detain another in certain cases. It will be a justification of a battery if a man hold another to restrain him from mischief. (Com. Dig. Battery, H.) If two persons be fighting and there be reason to fear that one of them will be killed by the other, it will be lawful to part and imprison them till their anger shall be cooled. (Bac. Abr. Trespass, D; 2 Roll. Abr. 559.) It is lawful for every man to lay hands upon another to preserve public decorum ; as, to turn him out of church and prevent him from disturbing the congregation, or a funeral ceremony. (*Glever* vs. *Hynde*, 1 Mod. 168; *Hall* v.

*Plumer*, 1 Lev. 196.)   So, if a person intend doing a right act, as to assist a drunken man or prevent him from going along the street without help and a hurt should ensue, he would not be answerable. (Bull N. P. 16.)   And private persons may justify breaking and entering the plaintiff's house and imprisoning his person to prevent him from murdering his wife.   (*Handcock* v. *Baker*, 2 B. & P. 260.)"   What follows in the opinion quoted from may be applied literally here : " Upon these authorities and upon the obvious necessity of the case, if no authorities could be found, the original restraint of the plaintiff by the defendant was justifiable.   There was evidence that the plaintiff at the time of his (her) confinement (in this case immediately before) was so insane that it would have been dangerous to himself (herself) * * * to permit him (her) to be at large.   If it be lawful ' to lay hands upon another' to preserve public decorum ; to imprison persons till their anger shall be cooled lest they should kill each other; to break into a man's house * * * lest he should murder his wife, it was certainly lawful for the defendant to imprison the plaintiff whose state of mind was such as to expose himself (herself) and those dependent upon him * * * to physical suffering and perhaps to death."   To do this the defendants " needed no warrant."   The " original restraint " of the plaintiff consisted in removing her in the carriage against her will from New York city to White Plains.   What took place before that event is not complained of.

Being justified in the temporary restraint imposed by reason of the plaintiff's condition, it became the duty of the defendants at once to invoke the agencies established by law, for the care and protection of the insane, and to institute that proceeding which was required to authorize her further detention.   That is exactly what they did.   They took the plaintiff to one of the most prominent hospitals or asylums for the insane in the country.   There she was examined by two authorized examiners in lunacy, who certified that she was a lunatic who should be committed.   A justice of the Supreme Court approved their certificate.   The defendants were authorized to institute the proceeding — at their own peril if they had not real ground for it, but under the shield of the law, if they had.   It was done under the permission of the statute.   If the

depositions of the examiners were not as definite or positive as they should have been, that was not the fault of the defendants. They were right in setting the proceedings in motion. It was not with them a case of probable, but of real cause. The occurrences of the night before show that. The approval of the justice of the Supreme Court was founded upon evidence which satisfied him, and unless he acted without jurisdiction and the entire proceeding was void, the defendants are not liable for the plaintiff's detention under the certificate. In actions for false imprisonment a defendant acting in good faith, may rely for protection on the order of a court, even where that order is granted on evidence which does not show sufficient cause for arrest. (*Landt* v. *Hilts*, 19 Barb. 283; cited with approval and commented upon in *Marks* v. *Townsend*, 97 N. Y. 590, and *Fischer* v. *Langbein*, 103 id. 93.) There is nothing in the provisions of the statute under which the defendants proceeded in this matter (Chap. 446, Laws of 1874) to change the rule. In *Ayers* v. *Russell* (50 Hun, 287) it is said that the act of a judge in approving a certificate of physicians under chapter 446, Laws of 1874, was a judicial act. "It was an act analogous to the issuing of a warrant for the arrest of an alleged criminal upon information verified by oath." The depositions of the physicians showed that *they believed* the plaintiff to be insane, but not, in terms, that she was actually dangerous at the very hour she was examined at White Plains. There was incompleteness perhaps in that regard in the depositions, but the justice was called upon to decide or adjudicate on the evidence (not necessarily confined to the *depositions* of the doctors) and he did so. He was not without jurisdiction to act at all, unless it must be held that, to confer jurisdiction, the deposition must contain a statement that the lunatic had exhibited dangerous tendencies in the presence of the physicians and at the very time the examination was made by them. We cannot so hold. All the statute requires is that the certificate shall set forth "the insanity of such person." When the justice acted it protected the defendants. They had done in good faith and from commendable motives, from all that appears, that which the law authorized them to do. The certificate and approval would protect the examiners in lunacy in the absence of negligence or fraud (*Ayers* v. *Russell, supra*), and it shields the defendants.

But the learned counsel for the appellant in his able argument claimed that the justice of the Supreme Court who approved the certificate had no jurisdiction, because authority is conferred by the statute only upon a judge of the county or judicial district in which the alleged lunatic resides.   Section 1 of the act of 1874 so provides, but it is evident it relates only to residents of the State of New York.   Otherwise it would be unlawful to approve certificates in cases of strangers or non-residents found insane within this State, and that such cases are not infrequent is well known.   This plaintiff had no residence in the State of New York.   She came into it.   She could not be left at large, and was in the care, and put herself, or she was put, in the custody of her relatives who sought to provide for her security and for the treatment of her malady.   They were not bound either to desert her in her extremity and misfortune, or turn her over to the police to be treated as an insane pauper.   They took her to the nearest accessible, and one of the best asylums, became responsible for the expenses of her treatment by which she was so much benefited that she was shortly discharged cured.   They are guiltless of wrong.

There was nothing to go to the jury, and the judgment and order must be affirmed, with costs.

O'BRIEN, INGRAHAM and MCLAUGHLIN, JJ., concurred; VAN BRUNT, P. J., dissented.

Judgment and order affirmed, with costs.