FRED WARNER, Appellant, *v.* STATE OF NEW YORK, Respondent.
(Claim No. 27846)

Argued October 9, 1947; reargued March 18, 1948; decided April 22, 1948.

*Joe Schapiro* for appellant. I. Claimant's admission and detention were illegal, deprived claimant of his liberty and were in violation of his personal rights. (*Rizzo* v. *Riddell*, 262 App. Div. 779; *MacDonnell* v. *McConville*, 148 App. Div. 49, 210 N. Y. 529; *Thomas* v. *First Nat. Bank of Lisbon*, 263 App. Div. 476; *Mandeville* v. *Guernsey*, 51 Barb. 99, 50 N. Y. 669; *People* v. *Hoch*, 150 N. Y. 291; *Matter of Clarkson*, 186 App. Div. 575, 227 N. Y. 599; *Hoff* v. *State*, 279 N. Y. 490.) II. Claimant is entitled to damages. (*People* v. *Weiss*, 276 N. Y. 384; *Vernes* v. *Phillips*, 266 N. Y. 298; *Grago* v. *Vassello*, 173 Misc. 736; *Rizzo* v. *Riddell*, 262 App. Div. 779; *Fischer* v. *Langhein*, 103 N. Y. 84; *Tierney* v. *State of New York*, 266 App. Div. 434, 292 N. Y. 523; *Shattuck* v. *State of New York*, 166 Misc. 271, 254 App. Div. 271; *Clark* v. *Nannery*, 292 N. Y. 105.)

*Nathaniel L. Goldstein, Attorney General* (*John R. Davison, Wendell P. Brown* and *Ronald E. Coleman* of counsel), for respondent. I. Claimant was legally admitted and confined in the Marcy State Hospital as an insane patient suffering from a paranoid condition. (*Emmerich* v. *Thorley*, 35 App. Div. 452; *People ex rel. Benson* v. *Burdick*, 215 App. Div. 163; *People* v. *Braun*, 158 N. Y. 558; *People ex rel. Edwards* v. *Superintendent*, 235 N. Y. 398; *People ex rel. Peabody* v. *Chanler*, 133 App. Div. 159, 196 N. Y. 525; *Collins* v. *Loisel*, 262 U. S. 426; *Christiansen* v. *Weston*, 36 Ariz. 200; *Hanna* v. *Stedman*, 230 N. Y. 326; *Niehoff-Schultze Grocer Co.* v. *Gross*, 205 App. Div. 67; *Joannes*

*Bros. Co.* v. *Czarnikow-Rionda Co.*, 121 Misc. 474; *Maxwell* v. *Maxwell,* 189 Iowa 7; *Colby* v. *Jackson,* 12 N. H. 529.) II. It was the duty of the officers directing Marcy State Hospital to bring claimant to that institution and to detain him there. (*Mudge* v. *State of New York,* 271 App. Div. 1039; *Douglas* v. *State of New York,* 296 N. Y. 530; *Emmerich* v. *Thorley,* 35 App. Div. 452.) III. In any event claimant's detention in the Marcy State Hospital, subsequent to the order of commitment of July 5, 1944, was lawful and insofar as the award made by the Court of Claims included compensation for damages sustained by him during such period, it was excessive. (*People* v. *Braun,* 158 N. Y. 558; *People ex rel. Edwards* v. *Superintendent,* 235 N. Y. 398; *People ex rel. Peabody* v. *Chanler,* 133 App. Div. 159, 196 N. Y. 525.) IV. Claimant, having been properly admitted and detained in the Marcy State Hospital, failed to prove any cause of action for damages for the injuries allegedly sustained in the course of the shock treatments given to him. V. The urgency and necessity for claimant's summary restraint and detention have been shown. But, if the proof is still deemed inadequate this is due to the trial court's error in the exclusion of testimony and the State should be afforded an opportunity to adduce further proof in respect thereto. (*Davis* v. *Merrill,* 47 N. H. 208; *Van Deusen* v. *Newcomer,* 40 Mich. 90; *Emmerich* v. *Thorley,* 35 App. Div. 452; *Look* v. *Dean,* 108 Mass. 116; *Keleher* v. *Putnam,* 60 N. H. 30; *Maxwell* v. *Maxwell,* 189 Iowa 7; *Crawford* v. *Brown,* 321 Ill. 305; *Colby* v. *Jackson,* 12 N. H. 526; *People ex rel. Benson* v. *Burdick,* 215 App. Div. 163; *People ex rel. Edwards* v. *Superintendent,* 235 N. Y. 398; *People ex rel. Peabody* v. *Chanler,* 133 App. Div. 159; *People* v. *Braun,* 158 N. Y. 558.) VI. The common-law privilege of summary arrest and detention has survived enactment of the Mental Hygiene Law. (*Sporza* v. *German Sav. Bank,* 192 N. Y. 9; *Keleher* v. *Putnam,* 60 N. H. 30; *Emmerich* v. *Thorley,* 35 App. Div. 452; Sutherland on Statutory Construction [3d ed.], Vol. 3, § 5305, p. 14.)

FULD, J. Fred Warner was a fairly successful farmer owning and operating a farm in Madison County, New York. He was married in 1924, and continued to live with his wife and one child until 1944, when the events which gave rise to this action

occurred. His marital life had been increasingly disturbed by domestic troubles between himself on one side and his wife and mother-in-law on the other.

On June 18, 1944, the wife called upon the town health officer — who happened to be the family physician — and complained about claimant's behavior and mental condition. She described her husband as a man of peculiar traits and eccentricities ranging from argumentativeness and irritability to delusions that her hands " were poison " and that it was necessary to lock the doors against thieves.

Without either seeing or examining claimant, the health officer telephoned the Marcy State Hospital, a State institution for the mentally ill, and forwarded to it a certificate requesting claimant's admission. Three days later, on June 21, claimant was interrupted at his work by a State trooper and three employees of the hospital. They took him, against his will, though without violence, to the institution in an ambulance. Upon arrival, he was given a cursory physical examination and admitted — as appears from a hospital record then made and entitled " Admission Note " — " on an H. O. [Health Officer's] Certification." I merely note at this point that that certificate was concededly defective since it appeared on its face that the health officer had not, as section 72 of the Mental Hygiene Law required, personally examined the subject. Claimant, though he frequently demanded his release, remained in the hospital for two months. While there he was given, over his objection, several electric shock treatments which produced convulsions, broke his arm and injured his back.

On July 5, two weeks after claimant's admission in the manner related, a court order was signed, upon petition of the wife, directing his commitment to the institution. There is no doubt that that order was in form valid and proper, having been obtained in accordance with section 74 of the Mental Hygiene Law. During claimant's confinement, his sister initiated a proceeding, pursuant to section 76 of that law, to review the July court order, and on August 21, after a trial, a jury found him sane and the court entered an order so adjudging him and directing his release. The State and hospital authorities took no appeal — although privileged so to do

(*People ex rel. Benson* v. *Burdick,* 215 App. Div. 163, 165) — and claimant returned to his home, to live and work there as he had before.

Some time after his release, claimant brought this action for false imprisonment, asserting that both the original arrest and the detention for the entire period between June 21 and August 21 were unlawful. The Court of Claims awarded some $6,000 in damages, including sums for personal injuries and loss of crops and livestock. Both State and claimant appealed; the latter contending that the damages awarded were inadequate, the State, that no cause of action was established. The Appellate Division, adopting the State's view, reversed and dismissed the claim.

We do not agree entirely with the determination made in either court. In our view, there was no warrant or justification for the original arrest or for the restraint up to July 5 — and the claimant is entitled to damages therefor — but the court order of July 5, being valid, authorized claimant's subsequent confinement and protected the State from any further liability for false imprisonment after that date. (See *Douglas* v. *State of New York,* 296 N. Y. 530, affg. 269 App. Div. 521; *Clark* v. *Nannery,* 292 N. Y. 105, 108; *Hendrix* v. *Manhattan Beach Development Co.,* 181 App. Div. 111, 117; see, also, Restatement, Torts, § 122.) Claimant's contention, that, if the initial restraint was wrongful, the hospital was under the necessity of first releasing and then rearresting him if it chose to rely upon the court order, is without merit. (See *Clark* v. *Nannery, supra,* p. 108; *Hendrix* v. *Manhattan Beach Development Co., supra,* p. 117; *Gearity* v. *Strasbourger,* 133 App. Div. 701, 704.)

The detention prior to July 5 must, however, stand upon a different footing; if without basis, the later court order will not absolve the State from liability already incurred (see *Clark* v. *Nannery, supra,* p. 108; *Hendrix* v. *Manhattan Beach Development Co., supra,* p. 117; *Ingo* v. *Koch,* 127 F. 2d 667, 671), and, accordingly, we turn to a consideration of that original restraint.

It is settled that one who arrests or restrains another may be liable for pursuing illegal or improper procedure as well as for acting upon an insufficient or improper basis. (See *Snead* v. *Bonnoil,* 166 N. Y. 325, 328; *MacDonnell* v. *McConville,* 148

App. Div. 49, 53, affd. 210 N. Y. 529; *Rutherford* v. *Holmes,* 66 N. Y. 368, 372; *Ingo* v. *Koch, supra,* p. 671; *Look* v. *Choate,* 108 Mass. 121, 122–123.) With that in mind, we examine the facts before the hospital officials on June 21 when claimant was first taken into custody to ascertain whether they — and through them the State — were justified in adopting the procedure they did to effect claimant's detention. We seek in vain a rule of common law or a provision of statute for such justification.

The common law recognized the power to restrain, summarily and without court process, an insane person who was dangerous at the moment. The power was to be exercised, however, only when " necessary to prevent the party from doing some immediate injury either to himself or others " (*Anderdon* v. *Burrows,* 4 Car. & P. 210, 213, 172 Eng. Rep. 674, 675) and " only when the urgency of the case demands immediate intervention." (*Keleher* v. *Putnam,* 60 N. H. 30, 31; see, also, *Scott* v. *Wakem,* 3 Fost. & Fin. 328, 334, 176 Eng. Rep. 147, 149; *Look* v. *Dean,* 108 Mass. 116, 120 *et seq.; Witte* v. *Haben,* 131 Minn. 71, 74; *Colby* v. *Jackson,* 12 N. H. 526, 530–531; 9 Bac. Abr. [1876], Trespass, p. 469; Buswell, Law of Insanity [1885], § 23; Note, 56 Yale L. J. 1178, 1185.) On the other hand, insane persons who were not dangerous were " not liable to be thus arrested or restrained ". (*Look* v. *Dean, supra,* p. 120.) And upon one who did the restraining rested the burden of showing, in order to justify it, the urgency and necessity for the immediate restraint. (See *Scott* v. *Wakem, supra; Emmerich* v. *Thorley,* 35 App. Div. 452, 456; *Crawford* v. *Brown,* 321 Ill. 305, 316–318; *Maxwell* v. *Maxwell,* 189 Iowa 7, 13; *Boesch* v. *Kick,* 97 N. J. L. 92, 96–97.) *Emmerich* v. *Thorley* (*supra*) — relied upon by Judge DESMOND in his dissenting opinion — is a striking illustration of the sort of case wherein summary restraint is justifiable. There, the plaintiff who had been summarily and forcibly restrained was actually in the act of throwing herself out of a window to escape fancied pursuers — and, as the court there noted, " it was only by the exertion of force by Mr. Thorley that she was overcome, and she was not quieted until her strength was exhausted " (35 App. Div., at p. 454).

The State has enacted legislation dealing with the admission procedures to be followed in committing and confining the mentally ill (Mental Hygiene Law, art. 5), but that did not affect the existence of the common-law privilege of summary arrest and detention. The statute did not abolish or curtail the power in a proper case; nor did it, by the same token, enlarge the area of its exercise. As before, only where immediate and precipitate action is demanded to prevent present and imminent harm, may the power be exercised. In lesser emergencies, the statute points the swift and expeditious admission procedures to which resort must be had. It is by one of those methods that any party — State or individual — must move where something less than present and imminent danger threatens. In section 75 of the Mental Hygiene Law, for instance, provision is actually made for the commitment of a person so " dangerous " that it is " necessary for public safety that he be immediately confined ". Only in emergencies beyond those words may the summary common-law power be utilized. The facts in the case before us portended no such emergency.

Perhaps to one trained in psychiatry, the facts developed at the trial might indicate that Warner suffered from a paranoid condition. That, however, is not the issue. The question is whether he was shown to be so dangerous at the time of his admission that resort to the extraordinary measure of summary restraint was necessary for his own and the public's safety. We believe it very clear that there was no such showing. It is undisputed that Warner had committed no overt act forecasting danger to himself or others, either before he was arrested, at the time of his arrest and admission, or during the period that he was confined. While a paranoid condition may sometimes erupt suddenly in some dangerous act, it may, on the other hand, slumber indefinitely; one who suffers from it may conduct himself for years, throughout life even, peaceably and quietly, with no symptom other than a belief that he is being persecuted. (See White, Outline of Psychiatry [14th ed.], p. 150; Orgel, Psychiatry Today and Tomorrow [1946], pp. 308–309.) There is a great difference between a case such as that — where the condition merely may, at some future time, flare up — and one wherein there is imminent and immediate danger of harm unless

the patient is summarily restrained. Neither the health officer who requested Warner's admission nor the hospital authorities who took him in charge treated him as one who was so dangerous that he had to be summarily arrested: resort was had to a statutory admission procedure — section 72 of the Mental Hygiene Law — and the officials moved at a leisurely and unconcerned pace, the hospital actually letting several days elapse before sending for him and arresting him.

Necessity for summary arrest under the common-law rule not being shown, the State must find authority in some provision of statute; it points to sections 72 and 81 of the Mental Hygiene Law.

When claimant arrived at the hospital, he was admitted, as already noted, " on an H. O. [Health Officer's] Certification." While admission on such a certificate is sanctioned by section 72, the certificate here used and relied upon was defective, as even hurried perusal of it would have revealed. Since the request of the health officer had not been, as the statute demanded, " based upon a personal examination ", that official was in no position to certify that the subject was " in need of immediate care and treatment in an institution " because of mental derangement. Indeed, the certificate contained no statement of fact indicating that claimant had committed any act of violence or that he was then in need of such immediate care or treatment. That being so, the certificate, as the hospital must have appreciated, furnished neither authority nor power to detain claimant. This is not a case of a document which, though erroneously made, is valid on its face — in which instance, the State and its agents would be protected. (See, e.g., *Douglas* v. *State of New York, supra; Emmerich* v. *Thorley, supra,* p. 458; see, also, Restatement, Torts, § 122.) In the present case, the invalidity of, the deficiency in, the certificate were patent to all who read it; the hospital was not warranted in acting upon it.

Nor may the State justify the confinement under section 81 — assuming that it may now assert the protection of some statutory provision which its agents did not have in mind when they acted. The admission procedure there outlined applies only to " a psychopathic hospital, or a psychopathic ward in a general hospital, for the temporary observation, examination, care and

certification of mentally ill, mentally defective, or epileptic persons " (§ 81, subd. 2; see, also, § 81, subds. 3, 4), and not to " a state hospital " such as Marcy State Hospital (§ 60) — and, indeed, upon the reargument herein the Attorney-General frankly acknowledged the inapplicability of section 81.

Where personal freedom is at stake, insistence upon strict and literal compliance with statutory provisions is not only reasonable but essential. The State has a legitimate and vital interest in protecting its citizens from harm at the hands of potentially dangerous mental cases, but that is not the only interest to be served. The liberty of an individual, not yet adjudged insane, is too precious to allow it to be invaded in any fashion, by any procedure, other than that explicitly prescribed by law. Particularly is that true here, where the statute's demands are easily met and satisfied. Undoubtedly mindful of both the welfare of the patient and the necessities of emergency situations, the Legislature has provided a simple and swift admission procedure, especially for subjects who are " dangerous " or in need of " immediate care and treatment " (see, e. g., Mental Hygiene Law, §§ 72, 75, 81).

Agents of the State, as well as private citizens, are bound to observe the requirements of the law before an individual may justifiably be held in a mental institution and subjected to its impact and stigma; failure to do so renders the State liable for the wrong (Court of Claims Act, § 8).

It is our conclusion, then, that claimant established a cause of action by showing that he was forcibly taken into custody and whisked off to the hospital, and that his illegal restraint and confinement continued until his commitment received court sanction by the order of July 5. In the view thus taken, the testimony proffered by the hospital doctor, who examined claimant upon his arrival, as to whether claimant was " a subject for mental treatment " while at Marcy, could not affect the result of the case. It may, however, have some bearing on the amount of damages to be awarded (see *Tweed* v. *Western Union Tel. Co.*, 107 Tex. 247, 252; cf. *Scolavino* v. *State of New York*, 297 N. Y. 460, affg. 271 App. Div. 618; *Grasso* v. *State of New York*, 289 N. Y. 552; *Gallachicco* v. *State of New York*, 43 N. Y. S. 2d 439, 442) and, accordingly, upon the new trial to be had, such

evidence should be admitted for that purpose. (See *Haughey* v. *Belmont Quadrangle Drilling Corp.*, 286 N. Y. 584; cf. *Verstandig v. Schlaffer*, 296 N. Y. 997, amdg. remittitur in case 296 N. Y. 62.)

The judgment of the Appellate Division should be reversed and that of the Court of Claims modified by granting a new trial solely upon the question of damages, and, as so modified, affirmed, with costs to appellant in all courts.

DESMOND, J. (dissenting). On June 21, 1944, plaintiff was taken, against his will, by employees of Marcy State Hospital, to that hospital, and there confined. The purported authority for that taking and detention was a written request by a local health officer drawn up in an effort to comply with section 72 of the Mental Hygiene Law. That written request was not, however, " based upon a personal examination " by the local health officer, nor did it state that such examination had been had. The paper, therefore, was not such as is described in section 72 and so was in itself of little or no legal effect as a justification for the detention of plaintiff. However, the document did contain, over the health officer's signature, a statement of that physician's opinion that claimant was " in need of immediate care and treatment in an institution for the treatment of mental disease ". It went on to state the reasons for that opinion, consisting of quotations from a statement by claimant's wife, which the health officer said he believed to be true. The wife's statement described conduct of a generally paranoiac nature. The senior physician of the State Hospital testified at the trial that he examined claimant on admission, but that physician was not permitted to testify as to what that examination consisted of or as to whether he (the physician) was of the opinion that claimant needed medical treatment. That physician did testify at the trial that he recommended electric shock treatments for claimant because, in the witness' opinion, claimant was suffering from a mental disorder " featured essentially by paranoid reactions." A week after claimant's admission to the hospital, and again a few days later, there were written into the hospital records long statements by hospital attaches, of claimant's condition, containing data suggestive of paranoia. Those writings, also, were excluded from evidence. On July 5, 1944, after claimant had been in the hospital for two weeks, two

qualified medical examiners, not connected with the State hospital, swore to a certificate in the form required by section 74 of the Mental Hygiene Law, for a court commitment, and the commitment of claimant was ordered by a County Judge. That order was based in part on the written opinion of these two examiners that claimant was " mentally sick and a proper subject for custody and treatment in some institution for mental disease " and in part on the petition of claimant's wife, which petition contained the same information found in the local health officer's report, hereinabove referred to. The County Judge's order contained an express adjudication that claimant was " insane " and it is clear that the order was adequate authority for the restraint of claimant thereafter. However, we are told that the State is absolutely liable for such damage as claimant suffered on June 21st and between that date and July 5, 1944. This result can follow only from a holding that, despite the information furnished to the Marcy officials on June 21st, and despite their own examinations and opinions, the removal of claimant from his home to Marcy and his detention at Marcy from June 21st to July 5th was a trespass, without any legal justification or excuse, leaving open to question only the amount of his damage. In turn, such a holding must result from a theory of law that the State and its agents have absolutely no power to seize or hold mentally sick persons except upon exact and literal compliance with statutory forms, or that the State and its agents can so hold or seize such a person, without following those exact statutory procedures, only if the person is raving mad. To hold the State absolutely liable here for the June 21st to July 5th period, we must go even further and decide for ourselves that there was no danger or urgency at all, in this claimant's condition, on June 21, 1944. Such a version of the law goes very far, indeed.

Article 5 of the Mental Hygiene Law describes in detail the appropriate procedures for admitting persons to hospitals for the mentally ill. Nowhere in that article does there appear any statement or indication that these procedures are absolutely exclusive, or that the common-law powers of the State (and of private persons) to take custody of the insane, have been totally withdrawn by the Legislature. This State has had " lunacy laws " of one sort or another for decades. Some of them had

been in effect for many years when *Emmerich* v. *Thorley* (35 App. Div. 452) was decided. That well-considered and authoritative case holds, with a wealth of citation from England, and from various United States jurisdictions, that private persons without judicial or other public authorization may restrain mentally sick persons who are dangerous to themselves or others. There is no reason for concluding that such is no longer the law even as to private persons, and the persons who arrested and detained this claimant were not private persons at all, but agents of the State, the duty of which, as *parens patriæ* of persons of unsound mind, is to protect them, and the community from them (*Sporza* v. *German Sav. Bank,* 192 N. Y. 8).

*Emmerich* v. *Thorley* (*supra*) and similar cases hold that while a private person may summarily detain without a warrant one who is dangerously insane, that person, acting without process, does so at his peril and is liable in damages unless the restraint is " necessary ". In the present case, the Appellate Division, reversing the Court of Claims, made findings to the effect that claimant was, on June 21, 1944, dangerously insane. The evidence, which is on this point undisputed, not only preponderates in favor of that finding, but can hardly lead to any other conclusion.

Was this claimant "dangerous "? Qualified persons thought he was a paranoiac. Paranoia is a psychosis and persons suffering therefrom are psychotics who need medical treatment, and sometimes show sudden and unpredictable outbursts of violence. " In dealing with paranoiacs it must be remembered that one is dealing with a class of patients who are potentially dangerous, that to this group belong perhaps the most dangerous of the so-called insane, and aside from matters of psychoanalysis, or in fact of any questions of therapeutic endeavor, it must be realized that where it is evident that the welfare of the individual and the welfare of society cross, the welfare of the individual must give way in favor of that of society. If the paranoiac is actually dangerous it is necessary to intern him in some institution where he will get proper care. The question as to whether a given paranoiac is dangerous or not, in the absence of overt acts, is often an extremely difficult one to decide " (Diseases of the Nervous System, Jelliffe and White, p. 986).

Fifty years ago this court knew of this dangerous disease (*People* v. *Braun,* 158 N. Y. 558, 564).

Given symptoms of paranoia, the decision as to whether a peculiar paranoiac is or is not dangerous is for qualified physicians to make. The courts cannot close their eyes to modern medical learning, or act as their own experts on psychiatric problems.

I agree with the Appellate Division that "upon the whole record in the case * * * the claimant was properly and legally admitted to Marcy State Hospital and was properly and legally treated and confined in said hospital from June 21, 1944, to August 21, 1944, both dates inclusive." I accordingly favor affirmance, with costs.

LOUGHRAN, Ch. J., LEWIS and CONWAY, JJ., concur with FULD, J.; DESMOND, J., dissents and votes for affirmance in opinion in which THACHER and DYE, JJ., concur.

Judgment reversed, etc.