Caboline K. 'Simon, J.
Mrs. Mary L. Kelly, a Queens housewife, left her home where she lived with her husband at about 5:00 p.m. on Thursday, January 27, 1966. She testified that she had experienced pains in her stomach and nausea, and went to the emergency clinic of the Queens Hospital Center for treatment. Her husband, a pharmacist, was at work at the time. Mrs. Kelly told the admitting clerk that she might have been poisoned.
She was asked to wait until an interne arrived. When the interne came he noted her personal history on a report form, interviewed her and then asked her to wait for another doctor. When the second doctor arrived, he identified himself as a psychiatrist, and questioned her about the poisoning aspect of her problem. Mrs. Kelly told him that she believed her husband and “ a group ” poisoned her.
The psychiatrist recorded the interview and left, asking her to wait again. She did so, telephoning her husband in the interval. Mr. Kelly arrived at the hospital and spoke to his wife in the corridor, asking her to come home with him, but she replied that she wanted to stay and see if she had been poisoned.
Thereafter upon the certification of two Queens Hospital Center physicians, and pursuant to section 70 (subd. 1, par. [c]) and section 72 (subd. 1) of the Mental Hygiene Law, Mrs. Kelly was transferred by ambulance, accompanied by an attendant and a policeman, to Creedmoor State Hospital in Queens Village at about 9:0Q p.m. that evening.
Upon admission to the latter institution, she was examined and her condition was diagnosed as “ involutional psychosis, paranoid type ”. Mrs. Kelly remained at Creedmoor from January 27 to February 3, on which latter day she was released with the consent of the Creedmoor authorities in her husband’s custody and under the care of her own family physician.
Mr. and Mrs. Kelly have filed this claim, alleging negligence of the State of New York in
“ (a) * * * accepting and taking custody of mart l. kelly as an involuntary patient in creedmoor state hospital without acquiring, examining or requiring proper certification for such purpose;
*468 “ (b) for malpractice of the personnel of said hospital in retaining said mart l. kelly without medical cause or need and while knowing and believing said mary l. kelly to be harmless to herself or others;
“ (c) for false arrest * * * placing her in a ward for violent patients, retaining her in custody without her permission and consent * * *
“(d) for false imprisonment * * # detaining her at said hospital without cause or reason and without proper certification * * *
“ (e) for wrongful detention * * * by the state in that said arrest, custody and imprisonment were without proper certification, without court order * * * mary l. kelly was denied an opportunity to see or contact a member of her family or her attorney for four days after her arrest and in spite of her husband presenting himself at said hospital and demanding to see his wife ”.
The claim has been timely filed in the office of the Attorney-General and with the Clerk of the Court of Claims on April 26, 1966. It seeks $75,000 for Mrs. Kelly’s pain and suffering, $25,000 for Mr. Kelly’s loss of his wife’s services and consortium, and $113 in medical expenses, hospital bills and medicine. This claim has neither been assigned, nor tried, nor brought before any other court or tribunal, but a suit for illegal detention and malpractice, based upon some of the same facts and some similar allegations is pending in the Supreme Court against the City of New York.
It is claimants’ contention that Mrs. Kelly was improperly committed to Creedmoor because of its failure to comply fully with the provisions of section 70 (subd. 1, par. [c]) and section 72 '(subd. 1) of the Mental Hygiene Law, which requires that two physicians certify to the mental illness warranting hospitalization. Chapter 738 of the Laws of 1964 changed section 70 (subd. 1, par. [c]) by increasing the number of physicians required from one to two.
In the instant case, two copies of form 471a, titled ‘ ‘ Examination by an Examining Physician ”, prescribed by the Department of Mental Hygiene and revised as of September, 1965, were introduced into evidence as part of Exhibit B. The forms contained six printed topic heads, each one followed by a number of blank lines on which the physician is required to supply the necessary and pertinent information as to the patient’s condition.
For a more thorough understanding of this procedure, the court lists the printed topic heads as follows:
*469 “1. Pertinent and Significant Factors in Patient’s Medical and Psychiatric History:
“2. Physical Condition (including any special test reports) “3. Mental condition: The conduct of the patient (including statements made to me by others) has been “4. The patient showed the following psychiatric signs and symptoms:
“5. Does the patient show a tendency to injure himself?
....................; to injure others?
Explain............................
“6. Mental diagnosis (if determined)
I, .................................... do certify
(Print Name or Names Plainly) as follows:
“a. I have with care and diligence personally observed and examined on the date of this certificate, namely, on
the..............day of..................19____,
...................................now residing or
(Insert Name of Patient)
being at ..................................., in the
county of.........................and as a result of
such examination, find and hereby certify to the fact that he is mentally ill and a proper subject for care and treatment in an institution or facility for the mentally ill under the provisions of the Mental Hygiene Law.
“b. I have formed this opinion from the history of the case and my examination of the patient as given above.
“c. I hereby certify that the facts stated and information contained in this certificate are true to the best of my knowledge and belief.
........................M.D......................
SIGNATURE ADDRESS
........................M.D......................
SIGNATURE ADDRESS ”
Part of Exhibit B
In Mrs. Kelly’s case, two such forms were employed. One was completely filled in by the examining physician and included statements handwritten by him in the appropriate spaces outlining Mrs. Kelly’s condition and symptoms. The court has deleted these details from its decision out of consideration for Mrs. Kelly, but finds that there was full compliance with the requirements of the Mental Hygiene Law in the preparation of this form.
*470 The second, an identically printed form, contained a second physician’s handwritten statement opposite Topic Head No. 1 stating:
‘ ‘ I concur with Dr...................’s Examination
in all respects.”
There follows a complete filling out of the certifying clause (No. 6), including the second physician’s name, the date, the name and address of the patient and the physician’s signature and address.
The form provides space to be completed by one doctor and signed by him, and, if the second doctor agreed with the findings, also signed by the second doctor. In the instant claim, the second doctor used a separate form. He expressed precisely and clearly his agreement with the first doctor’s findings. He stated that he concurred in all respects with those findings, and signed his name in the appropriate place. No proof was adduced to challenge the meaning of his statement of agreement. The court gives it the weight it deserves since it included the printed statement that he formed his opinion from the history of the case and his examination of the patient (see cited text, supra).
Claimants’ counsel, in addition to questioning the sufficiency of the first physician’s examination as outlined on his certificate, objects to the adequacy of the second certification, regarding it as insufficient in law and deficient on its face because of its lack of diagnostic information. He asserts his legal position involves a determination of first impression.
He relies, in a comprehensive trial memorandum, as well as a reply memorandum, on the case of Warner v. State of New York (297 N. Y. 395 [1948]), in which the State was held liable for false imprisonment in a mental hospital.
The court finds that fact pattern to be inapplicable to Mrs. Kelly’s situation, since there, Judge Fulu stated: “Without either seeing or examining claimant, the health officer telephoned the Marcy State Hospital, a 'State institution for the mentally ill, and forwarded to it a certificate requesting claimant’s admission.” (Warner v. State of New York, supra, p. 399.)
The court accepts, respects and agrees with the philosophy expressed in Warner v. State of New York (supra, p. 404) and cited by claimants’ counsel: “Where personal freedom is at stake, insistence upon, strict and literal compliance with statutory provisions is not only reasonable but essential * * *. The liberty of an individual, not yet adjudged insane, is too precious to allow it to be invaded in any fashion, by any procedure, other than that explicitly prescribed by law.”
*471 Changes in procedures for commitment have advanced as protection of individuals’ civil rights and society’s safety were developed on the considered basis of recognizing mental disturbance as an illness instead of a crime. Strong support for this changing philosophy is given by a comparison of today’s rules for certifying to the care of a hospital with those in effect earlier.
Emergency situations must be fitted into today’s admission procedures, and immediate treatment made possible where it seems needed. Thus, when Mrs. Kelly presented herself to a hospital stating that she believed her husband was poisoning her, she was examined almost at once.
State hospitals cannot be said to be seeking patients for selfish goals. The Mental Hygiene Department is charged with the duty to provide “ sufficient institutions, facilities and services in the department for the care and treatment of the mentally disabled of the state ”. (Mental Hygiene Law, § 22.)
In the instant situation, the husband knew of his wife’s presence in a hospital, and tried to persuade her to go home with him. She insisted, by her testimony and his corroboration, both adduced at this trial, that she wanted to stay and ‘ ‘ be cured ’ ’. Her examination and certification brought her to Creedmoor.
Claimants’ counsel pointed out that some parts of the certification form were printed. The court finds that fact attests to proper administrative effort to simplify and shorten admission procedures. Such efforts do not nullify nor vitiate effective functioning, but do save a doctor’s time from routine writing for the more important use of his skills in diagnosis and treatment.
The court does not substitute its judgment for the medical determination of the doctors, especially since no medical proof was adduced by claimant.
The court finds that the examination by two physicians was properly recorded, that the certifications were valid on their face and reflected the examinations required by law, and that the State was free of negligence in the commitment of Mrs. Kelly. The court also finds, though claimants’ counsel was skillful, that claimants have not proven by the necessary preponderance of evidence the other allegations in their claim. The claim must be, and hereby is dismissed. Since the claim of Mary Kelly is dismissed, the court also dismisses the derivative claim of her husband.
The motion to dismiss, made by the State, on which decision had been reserved, now is granted.