Frank S. Rossetti, J.
This claim, initially seeking total damages in excess of $3,000,000 sets forth seven causes of action sounding in false .arrest and malicious prosecution. It was originally presented on behalf of five individuals, all of whom were arrested by two State Troopers in the early morning hours of August 18, 1970.
Subsequent to the timely filing of said claim, an order of this court was entered whereby those causes .of action affecting or involving David P. Bullard and Mavis Z. Bullard, two of the above-named claimants, were dismissed. In connection therewith a motion was made and granted in open court amending the *1034 caption of this claim so as to delete the two afore-mentioned persons therefrom. The Clerk is directed to note the foregoing and to make the appropriate changes in the records of this court.
Throughout this eight-day trial, the court was disturbed by reason of the verbal clashes, on and off the record, between the respective attorneys. The proof was presented in an atmosphere of hostility which no doubt was generated by the many personal confrontations had during pretrial examinations, motions and cross motions initiated after the scheduled trial date, oral applications for a stay of trial and court rulings relative thereto. These events are mentioned, not as a criticism of three skilled members of the legal profession, but as an indication that their emotional involvement, for the most part, detracted from the orderly presentation of evidence.
Although it is not unusual in cases of this type to have conflicting testimony, our search for the truth became more difficult not only because of different versions by opposing witnesses but due, in some respects, to incongruous statements by each litigant’s own witnesses. Nevertheless, after carefully weighing the trial testimony against hundreds of pages of pretrial depositions and other documentary proof, the court, relying in part upon logical inferences, adopts the following material facts.
During the month of August, 1970, claimants were temporary residents in the Village and Town of Southampton, Suffolk County. They were all college students who had taken up employment for the summer months in the immediate area of Southampton and all resided in a boarding house thereat. Messrs. Robey and Noubarian were members of a five-piece rock band and Miss DeFilippis worked at a local restaurant as a waitress. At about 11:00 p.m. on August 17,1970, the three claimants together with the “Bullards” borrowed a Chevrolet panel truck (also called a “van”) from another band member, namely, Donald Falk, and drove to a relatively deserted area adjacent to the Southampton beach. At the same time, Mr. Falk and a female companion also visited the beach area in a separate vehicle. The vehicles were parked in a “ no parking zone ” and all seven persons went onto the beach. Just past midnight, two New York State Troopers (Officers Kruppo and Skarka) were on routine patrol and observed the vehicles unattended in a restricted parking area. Upon looking through the windows of the illegally parked van, which had Virginia license plates, the officers saw what they believed to be an *1035 American flag with a peace symbol in the upper left hand corner. It was attached to the left interior wall of the panel truck behind the driver’s seat. After making this cursory observation, the officers discussed the legal significance of this type of “flag” and thereupon concluded that it was desecrated in violation of section 136 (subd. a) of the General Business Law. At about this time with their flashlights beaming, they further observed seven persons coming in their direction from the beach area. These persons were then questioned with respect to the ownership of the van and to further ascertain which individuals had occupied same on the drive down to the beach. The officers learned that only five of the seven had previously been in the van and they further learned that Donald Falk was the registered owner. After receiving this information, Officer Kruppo asked Donald Falk if he could conduct a search of the van. Although there was a sharp conflict on this point, one of the claimants (Ellen DeFilippis) testified on direct examination that “he [Kruppo] wanted to search the van, if it was okay to search it and Donny said ‘ sure ’ ”.[1] The trooper then went inside the panel truck and confiscated the “flag” which was placed into his troop car. Immediately thereafter, the three claimants and the “ Bullards ” were placed under arrest for a violation of section 136 (subd. a) of the General Business Law. Having effected said arrest, a further search was conducted and a vial containing several amphetamine pills was found in the glove compartment of the van. The same five persons were again arrested and charged with possession of dangerous drugs in violation of section 220.05 of the Penal Law. No arrest was made of Donald Falle or his female companion, who were told that they could leave.
The five individuals were then placed into the back seat of the troop car and taken to the Southampton Village Police Station where they remained for about six hours. In the early morning they were transported to the Biverhead State Police Barracks for processing and, after being formally booked, were arraigned before local Magistrate at which time they were represented by counsel. Pleas of not guilty were entered on both charges and bail was fixed at $150 each. At about 1:00 p.m. on August 18,1970, bail was posted and all five individuals were released from custody. The claimants next appeared in *1036 court on September 17, 1970 at which time a hearing was held pursuant to a joint motion for an order of suppression. As a result thereof, Hon. Edwin A. Berkery, a Town Justice, made certain findings and issued an order suppressing any and all evidence and dismissed the criminal informations. No appeal was taken from Justice Berkery’s order.
Given this factual picture, the pivotal issue to be decided is whether the State Troopers, under all the circumstances, were justified in believing that reasonable and probable cause existed ■in charging claimants with either one or both of the aforementoned misdemeanors. Where an arrest and imprisonment are admittedly without a warrant, the presumption is that they were unlawful, and the burden of showing justification is on the State. Under the applicable statute at the time of1 the subject arrests, (Code Crim. Pro., § 177, subd. 1), a peace officer was authorized to effect an arrest, without a warrant, for a crime committed in his presence or where he had reasonable grounds to believe that a crime was being committed in his presence (now CPU 140.10).
In dealing with the flag arrest, the preponderance of proof shows that there were no reasonable grounds to believe that any of the claimants had committed a violation of section 136 (subd. a) of the General Business Law. The relevant portion of this statute reads as follows:—
“ Any person who: a. In any manner, for exhibition or display, shall place or cause to be placed, any word, figure, mark, picture, design, drawing, or any advertisement of any nature upon any flag, standard, color, shield or ensign of the United States of America * * * or shall expose or cause to be exposed to public view any such flag, standard, color, shield or ensign * * * shall be guilty of a misdemeanor ” (emphasis added).
This court did not have the benefit of examining the actual “flag” confiscated by the State Troopers in that it had been destroyed; however, we did receive in evidence a penciled drawing purported to be a fair representation of same. This exhibit together with the cumulative evidence revealed that the “flag” was made nut of a cardboard placard. It had red and white crayoned stripes with a drawing of a peace symbol in the upper left hand corner. This description is further supported by the findings of Justice Berkery who presided at the suppression hearing and did have an opportunity to see the ‘ ‘ flag ’ ’. He stated the following:
* ‘ Upon the hearing, the alleged flag was produced (Peo. Ex. 1). Examination disclosed that it was a paper banner *1037 displaying red and white stripes and in the upper left hand a symbol commonly known as the peace symbol. There was no indication that the banner had ever been a flag, standard, color, shield or design of the United ¡States upon which the peace symbol had been superimposed. Admittedly, the banner had been found on the left interior wall of the van behind the driver’s seat and was not exhibited or displayed within the purview of Section 136(a) of the General Business Law. (Peo. vs Street, 282 NYS 2d 491 [20 N Y 2d 231]).”
Although the foregoing findings are not binding upon this court (Brenon v. State of New York, 31 A D 2d 776), there can be no doubt that all of the credible proof produced at the subject trial confirms same.[2] Even if we were to assume that the troopers did in fact believe the “flag” to be desecrated, there still would be no justification for the arrest, since it certainly was not exposed to public view. Furthermore, and more importantly, after questioning the seven persons prior to the arrest, the officers knew that the van was owned by Donald Falk who also admitted owning the “ flag ”. These attendant facts can in no wise justify the action taken by the State Troopers. In the first place, there was no crime being committed in their presence and, secondly, if they believed that a crime was being committed, to wit, public display of a desecrated flag, there was no probable cause to arrest the claimants since it was known that they were not in actual or constructive possession of the “ flag ”.
Turning our attention to the dangerous drug arrest, it is undisputed that the pills found in the glove compartment were amphetamines and, on this charge, we have a somewhat different situation. The questions here prompted are twofold. The State contends that once consent for the search was given, the troopers had every right to rely upon section 220.25 of the Penal Law which, at the time, stated in part:
“ The presence of a dangerous drug in an automobile * * * is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time such drug was found
On the primary question of consent to search, claimants urge that any permission received from Donald Falk cannot be imputed to them. The court disagrees. It has been consistently held that the owner of an automobile may consent to a search *1038 and a third party may not object even where the search discloses property for possession of which the third party is subsequently prosecuted (People v. Lane, 10 N Y 2d 347; People v. Matthews, 21 A D 2d 883); and consent to a search freely given by one in authority destroys any claim of illegal search and seizure (Amos. v. United States, 255 U. S. 313).
■Based on the trial testimony and without second guessing the officers’ reasons for never before mentioning that consent was obtained, it would appear that a lawful search was made. However, this alone does not answer the secondary question related to justification for the drug arrest. The State’s argument in this regard can be sustained only if it is shown that the troopers had reasonable grounds to believe that claimants were knowingly in possession of the amphetamine pills.
Section 10.00 (subd. 8) of the Penal Law defines possession as “physical possession or otherwise-to exercise dominion or control over tangible property.” Certainly, at the time of claimants’ arrest they did not have physical possession of the “ drugs ” and their voluntary admission of having previously occupied the van did not, in fact, place claimants therein when such drugs were found. How then did they, under the prevailing circumstances, exercise dominion or control over the pills and knowingly possess same in order to give the officers probable cause to believe that a crime was being committed in their presenceÍ Claimants’ admission that they had been in the van is not sufficient, in our opinion, to allow a reasonably prudent officer to infer that a crime was being committed, or that claimants knowingly possessed the contraband. We must, therefore, conclude that the presumption under section 220.25 of the Penal Law does not come into play.
Furthermore, the trial record established that the van was situated at the same location for approximately one hour before ■the troopers happened upon the scene; that its doors were closed but not locked and claimants were frequenting a portion of the beach more than 100 yards away, at a point where, because of intervening sand dunes and high weeds, their view of the van was obstructed. These factors were known to the troopers before either arrest was effected. Additionally, the claimants were not known to the officers and had never before been observed in this area which was supposedly a “ haven for drug users ”. Finally, there was nothing unusual in claimants’ behavior or appearance to raise the level of inference from suspicion to probable cause.
*1039 Concededly, what attracted the 'State Troopers to the scene was the illegal parking of two vehicles. There can be no doubt that they were justified in checking the vehicles and to issue parking violations, which, it should be noted, was not done. They were further justified in questioning the seven persons who later approached the vehicles; however, their duties were properly discharged when they learned that the vehicles were not stolen and that the seven individuals were not engaged in committing any violations of law. Although this court is reluctant to criticize the actions of a police officer when properly engaged in the enforcement of our laws, we believe, under the circumstances of this case based on the totality of evidence presented, there were no reasonable grounds to arrest the claimants for either violation. In Henry v. United States (361 U. S. 98, 104) the Supreme Court clearly stated:
“ To repeat, an arrest is not justified by what the subsequent search discloses. Under our system suspicion is not enough for an officer to lay hands on a citizen. It is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to easy arrest.”
Accordingly, it is our determination that the State has failed to meet its burden of showing that the subject arrests were lawful, and claimants are, therefore, entitled to damages resulting therefrom.
Having reached this conclusion, we now proceed to those causes of action which, although barely discernible in the pleadings, appear to give rise to the claim for malicious prosecution. Unlike false imprisonment, where the burden of justification for the arrest is on the State, to sustain an action for malicious prosecution the burden is on claimants.
The essential elements to be proved are that the prosecution is begun in malice, without probable cause to believe it can succeed, and it finally ends in failure (Burt v. Smith, 181 N. Y. 1, 5). Although an officer lacks probable cause to make an arrest and the proceeding ends in claimants’ favor, there can be no recovery for malicious prosecution without evidence of actual malice (Schultz v. Greenwood Cemetery, 190 N. Y. 276, 278) and whether malice exists is a question of fact to be proved by the one asserting it (Munoz v. City of New York, 18 N Y 2d 6). On this trial record, we find claimants’ proof insufficient to sustain an action for malicious prosecution. Their charges of wanton and reckless acts ¡on the part of the State Troopers, particularly Officer Kruppo, have not been borne out by the credible evidence. Claimants’ proof in this respect was riddled *1040 with inconsistencies on the one hand and precise details on the other. In short, they have not affirmatively established, to our satisfaction, the truth on this issue. We, therefore, conclude that there was no showing of express malice and, further, we could find no wrongful o.r improper motive on the part of the State officers from which any malice could be inferred. (See Casler v. State of New York, 33 A D 2d 305.) As a result, all causes of action sounding in malicious prosecution are dismissed on the merits.
Relative to those damages flowing from the illegal detention of claimants, we find that they were falsely arrested and imprisoned to the time of their arraignment before the local Magistrate who then had jurisdiction of the charges and of claimants (Warner v. State of New York, 297 N. Y. 395; Caminito v. City of New York, 19 N Y 2d 931). The period of time involved some 13 hours and the expenses incurred in connection with their defense of the criminal proceeding amounted to $100 each. Claimants ’ proof with respect to pecuniary losses such as loss of earnings and loss of business was wholly unsubstantiated. Additionally, their self-serving statements relating to social ostracism at college and in their home communities were without support. Much of this testimony was allowed over objection on the representation by claimants’ counsel that it would be corroborated by other witnesses. No such corroboration was received excepting that given by Mr. Robey’s father who alluded to the emotional trauma experienced by him, Mrs. Robey and their son (claimant) when word of the subject arrests was brought home.
However, there was an article appearing in a Long Island newspaper (Newsday) which carried a photograph of the claimants captioned with “ State Police Seize 5, Charge Flag Violation ” and the notoriety received therefrom is an item of damages to be considered. Although none of the claimants resided or attended college in the Long Island area, it is not unreasonable to assume that there was some unpleasant publicity resulting from the news article. In our opinion, the most severe indignities attributed to the unlawful arrests were the photographing and fingerprinting of claimants. In this regard, we received testimony from two witnesses who had conducted studies and written articles related to the detrimental effects of an arrest record. The court was impressed with their expertise on this subject; however, it is by no means a simple task to make a dollar evaluation by applying their general impressions to the specifics at hand. We are aware that an arrest *1041 record may, at times, 'have an adverse effect 'On a .person’s employment opportunities even though a favorable disposition is made of the criminal charges. Notwithstanding, it would be pure speculation on our part to conclude that claimants will suffer from loss of employment or other social and business standing because of same. We must, therefore, be guided by the precedents established by our appellate courts in making a determination as to the adequacy of an award. (See 22 N. Y. Jur., False Imprisonment, § 61.)
In assessing damages, we have taken into consideration the indignities sustained by claimants, the attendant embarrassment to each of them, their stations in life, and the necessary expenses incurred in connection with the criminal prosecution.
Accordingly, the court awards William F. Robey, Jr., the sum of $3,000, Gary A. Noubarian the sum of $2,500 and Ellen DeFilippis the sum of $2,500. ¡Said awards consist of compensatory damages only and, pursuant to our findings hereinbefore set forth, no award is made for punitive or exemplary damages.
At the opening of trial, there were several motions made by the State related to the .pleadings and other aspects thereof. Decision was reserved at that time as it was upon the close of evidence when defendant moved for dismissal of the false imprisonment and malicious prosecution actions. We believe this writing contains all those findings required to be made in connection with said motions; however, for the purposes of clarity, we now deny all motions made by the State except that bearing upon the malicious prosecution cause of action.

. It is noted that Donald Falk and the two other claimants denied that permission to search was given and, further, the troopers had never before mentioned, during testimony given at pretrial examinations and the criminal proceeding, that such permission was obtained.

. It is interesting to note that two decisions held this section of the General Business Law to be unconstitutional. (See Long Is. Vietnam Moratorium Comm. v. Cahn, 437 F. 2d 344, and Gwathmey v. Town of East Hampton, 437 F. 2d 351.)