EMMERICH v. THORLEY et al.

(Supreme Court, Appellate Division, First Department.   December 9, 1898.)

1. FALSE IMPRISONMENT—CONFINEMENT OF INSANE PERSON.

Plaintiff was brought to her sister's house, and shortly thereafter the sister received a telegram from a physician at plaintiff's home saying that she would be confined as insane if brought back in the same condition. During the night, she left her room terrified, claiming that there were persons concealed under her bed, and attempted to throw herself from the window, and could only be overcome by the use of physical force. On the advice of a physician who had that night witnessed plaintiff's frenzied condition, the sister and her husband conveyed her to an asylum, without warrant or other authority, and then instituted proceedings to have her legally confined. *Held* that, by conveying plaintiff to the asylum without warrant, defendants were not guilty of having falsely imprisoned her.

2. SAME—COMMITMENT—DEFECTIVE CERTIFICATE.

Under Laws 1874, c. 446, § 1, requiring the commitments of insane persons to be made on the certificate of two physicians, approved by a judge of a court of record, where one, having proper cause, institutes proceedings to commit a person as insane, and two physicians certify as to his insanity, the court acquires jurisdiction, and the person instituting the proceedings is not liable for the detention of the alleged lunatic under the order approving the certificate, even though the certificate itself be insufficient.

3. SAME—SUFFICIENCY OF CERTIFICATE.

Under said provisions, it is not essential to the jurisdiction of the court that the certificate should state that the alleged lunatic exhibited dangerous symptoms at the very time of making the examination, and in the presence of the physicians.

4. SAME—NONRESIDENT INSANE.

Laws 1874, c. 446, § 1, requiring a physicians' certificate of a person's insanity to be approved by a judge or justice of a court of record of the county or district in which the alleged lunatic resides, does not prohibit the commitment of a nonresident of the state found insane within the state.

Van Brunt, P. J., dissenting.

Appeal from special term, New York county.

Action by Elizabeth Emmerich against Jennie Thorley and another. From a judgment for defendants, and from an order denying a new trial, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Jas. M. Hunt, for appellant.

Joseph Fettretch, for respondents.

PATTERSON, J.   This action was brought to recover damages for false imprisonment.   On the trial a nonsuit was directed, and, from the judgment entered thereon, the plaintiff appeals.   We are to inquire whether, upon the whole case, there was anything to go to the jury. The trial judge expressed a doubt as to the case being one for nominal damages, or for a dismissal of the complaint, but adopted the latter view, which we think, upon all the facts established, was the proper one.   The gravamen of an action for false imprisonment is an unlawful arrest and detention.   The plaintiff was restrained of her liberty by the defendants, who are her sister and her brother-in-law, and they procured her

commitment to an insane asylum. To justify their conduct, and relieve them from legal responsibility, they were obliged to show that such circumstances existed as authorized them to apply restraint and institute proceedings for the commitment. Unless the record shows such circumstances, without any conflict of evidence requiring the submission of disputed facts to a jury, the judgment cannot be sustained.

It was proven that on the 9th of December, 1895, at about 6 o'clock in the evening, the plaintiff, accompanied by her young daughter and a clergyman, appeared at the defendants' house, in the city of New York. Some conversation was had between the clergyman and the defendant Mrs. Thorley concerning the plaintiff's condition. The clergyman was the pastor of a church in New Jersey, and the plaintiff, who resided in that state, was a member of his congregation. Previously, and on the 7th of December, the defendants had received a telegram sent from New Jersey by a physician notifying them that the plaintiff was sick. After the plaintiff arrived at the defendants' house, on the night of the 9th of December, a telegram was received by Mrs. Thorley, signed, "J. T. Henry, M. D." It was sent from New Jersey, and was in the following words, viz.: "Mrs. Emmerich has been acting insanely. You must take charge of her, and see that she is kept perfectly quiet. Should she return here in same condition, it would be necessary to arrest and confine her." Those were the circumstances under which the plaintiff obtained shelter and protection in the defendants' house. She came to it without their invitation or suggestion, and they were ignorant before her arrival of her intention to visit them, or of the purpose of any one to bring her to them. She was a widow, or a divorcee. She was received by the defendants, and provision was made for her entertainment for the night. After retiring for a while to her room, she left it in her nightdress, exhibiting signs of great fear or terror. She declared that there were persons concealed in her room and under her bed, that she was followed by a woman (who was not in the house), and showed unmistakably that she was laboring under delusions of persecution. During that night she made attempts to escape from her fancied pursuers, by throwing herself from a window. It was only by the exertion of force by Mr. Thorley that she was overcome, and she was not quieted until her strength was exhausted. The testimony as to delusions of the plaintiff and her violent conduct comes from the defendants principally, but it is not denied by the plaintiff. Her testimony, carefully examined, only goes to the extent of declaring that she does not remember such occurrences as those sworn to by the defendants. It may be claimed that, as the evidence of the plaintiff's conduct comes from interested parties, their credibility should have been submitted to the jury. Such is undoubtedly the general rule (Williams v. Railroad Co., 155 N. Y. 158, 49 N. E. 672); but where there is corroboration of interested parties, and no real conflict, the action of the court may be based on their testimony (Anderson v. Boyer, 156 N. Y. 97, 50 N. E. 976). In this case there was corroboration. It is contained in the testimony of Dr. Reid, who was called in by the defendants on the evening of the 9th. He was not a stranger to the plaintiff, but had frequently treated her as her physician. He observed, on the night of the 9th, the hallucinations of the plaintiff, and her frenzied condition.

Among other exhibitions of wildness, he saw her go to the sick bed of the elder Mrs. Thorley, heard her declare that lady to be the woman who was pursuing her, and saw her approach the bed as if to do bodily harm to its occupant. On this state of the evidence, no other conclusion could be reached than that it was established that on the night of the 9th of December, 1895, this plaintiff was suffering from mental disturbance to the point of irresponsibility, and that she was a dangerous person, liable to commit acts tending to injure herself, in efforts to escape from fancied pursuers, and that, in her condition, danger might result to others, from her insane promptings, were she not put under proper and reasonable restraint. Acting on the advice of Dr. Reid, and in consequence of what they had observed, the defendants determined to take the proceedings provided by law for placing the plaintiff in an asylum for care and treatment. They made attempts to find accommodations for her in such an institution in the city of New York, but were unsuccessful in their efforts. On the 10th of December, they took the plaintiff, in their own private carriage, to the Bloomingdale Asylum, at White Plains, where she was examined by two physicians, examiners in lunacy not connected with the asylum; and, upon the depositions of those physicians, a justice of the supreme court approved the certificate under which she was detained in the asylum, where she remained for two or three weeks, and was then released.

The acts of the defendants connected with the restraint and detention of the plaintiff are claimed by her counsel to be unlawful in two respects: First, in the conveyance of the plaintiff from the city of New York to the asylum at White Plains; second, in instigating or procuring the so-called "commitment" of the plaintiff at White Plains. As to the first branch of the inquiry, the question is plainly presented of the legal responsibility of a private person, acting of his own motion, and without judicial warrant or process, for interfering with the liberty of another on an allegation of insanity. In such cases there is no justification for interference or restraint unless it is demanded by a real necessity for the care and safety of an individual, dangerous to himself, or for the protection of others, to whom he is or may be dangerous. Whoever, merely as a private person, applies such restraint, must act upon facts, and not upon suspicion or belief. He may have to take the responsibility of his errors of judgment. But, where the facts show the danger and the necessity, no actionable trespass is committed, and such has always been the law in England and in this country.

In 2 Add. Torts, p. 708, par. 819, it is said:

"A private person may, without warrant or authority, confine a person disordered in his mind who seems disposed to do mischief to himself or another person, the restraint being necessary both for the safety of the lunatic and the preservation of the public peace."

In Fletcher v. Fletcher, 28 Law J. Q. B. 136, Lord Campbell, C. J., says:

"By the common law of England, it is only a person of unsound mind, and dangerous to himself or others, that may be restrained of his liberty by another; and such is taken to be the law from the case in Brooke, Abr. (tit. 'Faux Imprisonment'), down to the last case on the subject."

And Weyburn, J., in the same case, says:

"At common law, any one taking up another as a lunatic, in order to justify himself, must show he is a dangerous lunatic."

Lord Tenterden, C. J., in Anderdon v. Burrows, 4 Car. & P. 210, states the rule to be that restraint of a lunatic is unauthorized, unless necessary to prevent the party from doing some immediate injury either to himself or others.

Of the American cases, Look v. Dean, 108 Mass. 116, is generally to the same point. Kelcher v. Putnam, 60 N. H. 30, decides that at common law a person's insanity justifies his arrest, without legal process in a case of reasonable necessity, by which is meant, doubtless, the dangerous condition of the lunatic. But the most useful and instructive of the American cases is Colby v. Jackson, 12 N. H. 529. It was decided in 1842, and may be considered the leading one on the subject. The following extracts from the opinion of the court, by Gilchrist, J., are pertinent to the case before us:

"But it is well settled at common law that a private person, without warrant, may lawfully seize and detain another in certain cases. It will be a justification of a battery if a man hold another to restrain him from mischief. Com. Dig. tit. "Battery," (H). If two persons are fighting, and there be reason to fear that one of them will be killed by the other, it will be lawful to part and imprison them until their anger shall be cooled. Bac. Abr. tit. "Trespass," (D); 2 Rolle, Abr. 559. It is lawful for every man to lay hands upon another to preserve public decorum; as to turn him out of church, and prevent him from disturbing the congregation, or a funeral ceremony. Glover v. Hynde, 1 Mod. 168; Hall v. Planner, 1 Lev. 196. So, if a person intend doing a right act, as to assist a drunken man, or prevent him from going along the street without help, and a hurt should ensue, he would not be answerable. Bull, N. P. 16. And private persons may justify entering the plaintiff's house, and imprisoning his person, to prevent him from murdering his wife. Handcock v. Baker, 2 Bos. & P. 260."

What follows in the opinion quoted from may be applied literally here:

"Upon these authorities, and upon the obvious necessity of the case, if no authorities could be found, the original restraint of the plaintiff by the defendant was justifiable. There was evidence that the plaintiff, at the time of his [her] confinement [in this case immediately before], was so insane that it would have been dangerous to himself [herself] * * * to permit him [her] to be at large. If it be lawful 'to lay hands upon another' to preserve public decorum, to imprison persons until their anger shall be cooled, lest they should kill each other, to break into a man's house, lest he should murder his wife, it was certainly lawful for the defendant to imprison the plaintiff, whose state of mind was such as to expose himself [herself] and others * * * to physical suffering, and perhaps to death."

To do this the defendants "needed no warrant." The "original restraint" of the plaintiff consisted in removing her in the carriage, against her will, from New York City to White Plains. What took place before that event is not complained of.

Being justified in the temporary restraint imposed by reason of the plaintiff's condition, it became the duty of the defendants at once to invoke the agencies established by law for the care and protection of the insane, and to institute that proceeding which was required to authorize her further detention. That is exactly what they did. They took the plaintiff to one of the most prominent hospitals or

asylums for the insane in the country.   There she was examined by
two authorized examiners in lunacy, who certified that she was a lu-
natic, who should be committed.   A justice of the supreme court ap-
proved their certificate.   The defendants were authorized to institute ·
the proceeding,—at their own peril if they had not real ground for it,
but under the shield of the law if they had.   It was done under the
permission of the statute.   If the depositions of the examiners were
not as definite or positive as they should have been, that was not the
fault of the defendants.   They were right in setting the proceedings
in motion.   It was not with them a case of probable, but of real,
cause.   The occurrences of the night before show that.   The ap-
proval of the justice of the supreme court was founded upon evidence
which satisfied him; and unless he acted without jurisdiction, and
the entire proceeding was void, the defendants are not liable for the
plaintiff's detention under the certificate.   In actions for false im-
prisonment, a defendant acting in good faith may rely for protection
on the order of a court, even where that order is granted on evidence
which does not show sufficient cause for arrest.   Landt v. Hilts, 19
Barb. 283, cited with approval and commented upon in Marks v.
Townsend, 97 N. Y. 590, and Fischer v. Langbein, 103 N. Y. 93, 8
N. E. 251.   There is nothing in the provisions of the statute under
which the defendants proceeded in this matter (chapter 446, Laws
1874) to change the rule.   In Ayers v. Russell, 50 Hun, 287, 3 N. Y.
Supp. 338, it is said that the act of a judge in approving a certificate
of physicians under chapter 446, Laws 1874, was a judicial act.   "It
was an act analogous to the issuing of a warrant for the arrest of an
alleged criminal upon information verified by oath."   The depositions
of the physicians showed that they believed the plaintiff to be insane,
but not, in terms, that she was actually dangerous at the very hour
she was examined at White Plains.   There was incompleteness, per-
haps, in that regard in the depositions; but the justice was called
upon to decide or adjudicate on the evidence (not necessarily confined
to the depositions of the doctors), and he did so.   He was not with-
out jurisdiction to act at all, unless it must be held that, to confer
jurisdiction, the certificate must contain a statement that the lunatic
had exhibited dangerous tendencies in the presence of the physicians,
and at the very time the examination was made by them.   We cannot
so hold.   All the statute requires is that the certificate shall set
forth "the insanity of such person."   When the justice acted, it pro-
tected the defendants.   They had done in good faith and from com-
mendable motives, from all that appears, that which the law author-
ized them to do.   The certificate and approval would protect the ex-
·aminers in lunacy in the absence of negligence or fraud (Ayers v.
Russell, supra); and it shields the defendants.

But the learned counsel for the appellant, in his able argument,
claimed that the justice of the supreme court who approved the
certificate had no jurisdiction, because authority is conferred by the
statute only upon a judge of the county or judicial district in which
the alleged lunatic resides.   Section 1 of the act of 1874 so provides,
but it is evident it relates only to residents of the state of New
York; otherwise, it would be unlawful to approve certificates in cases

of strangers or nonresidents found insane within this state; and that such cases are not infrequent is well known. This plaintiff had no residence in the state of New York. She came into it. She could not be left at large, and was in the care, and put herself, or she was put, in the custody, of her relatives, who sought to provide for her security, and for the treatment of her malady. They were not bound either to desert her in her extremity and misfortune, or turn her over to the police, to be treated as an insane pauper. They took her to the nearest accessible and one of the best asylums, became responsible for the expenses of her treatment, by which she was so much benefited that she was shortly discharged cured. They are guiltless of wrong.

There was nothing to go to the jury, and the judgment and order must be affirmed, with costs. All concur, except VAN BRUNT, P. J., dissenting.