**JILLSON v. CAPRIO.**

**No. 10149.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 6, 1949.

Decided Feb. 13, 1950.

Mr. Jean M. Boardman, Washington, D. C., for appellant.

Mr. H. Mason Welch, Washington, D. C., with whom Messrs. John R. Daily, J. Harry Welch, Washington, D. C., and J. Joseph Barse, Washington, D. C., were on the brief, for appellee.

Before EDGERTON, WILBUR K. MILLER, and WASHINGTON, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant's complaint charges among other things that appellee "directed * * * police officers to arrest plaintiff as an insane person; whereupon the police officers, acting upon the representations of defendant and under his direction, arrested plaintiff, assaulted her and over her protests and with great physical violence to her person dragged her from her home. * * * The aforesaid police officers, still acting upon the representations of defendant and under his direction imprisoned plaintiff in Gallinger Hospital * * *."

Appellee, a physician specializing in psychiatry, went to appellant's home on January 25, 1945, without appellant's consent, at the request of her husband, who said she had threatened to kill him and their child. Appellee did not know either appellant or her husband. Her husband, who was present, told appellee he was no longer living with appellant. He had taken away and concealed the child. Appellee talked for some time with appellant, who denied making threats, and with her husband. Appellee called the police. Appellant refused to go with the police because they had no warrant for her arrest but they overpowered her, carried her off, and took her to Gallinger Hospital. Her husband paid appellee fifty dollars.

At the trial appellant called several witnesses including appellee himself. Quotations from his testimony follow:

"Q. Did you tell Officer Bailey that in your opinion Mrs. Jillson was homicidal and suicidal? A. Yes, sir.

"Q. Did you tell Officer Bailey that the usual procedure to bring about the arrest of a person suspected of being insane was to secure a warrant supported by two affidavits? A. Yes, sir.

"Q. And did you tell Officer Bailey that in this case you didn't think that should be done because you wouldn't be responsible for what happened if she wasn't taken immediately? A. That is right. * * *

"Q. All right, proceed. They got her to the door— A. They got her to the door and just as they were walking toward the door with her I went downstairs with [her husband] to get into my car, and as I was walking downstairs I heard a lot of noise and she shouted and screamed, and as I looked back she was kicking the rungs of the stairway with her feet. That's about the last that I remember of seeing Mrs. Jillson at that time at the house. I got in my car and the police said they would have to make a stop at the precinct, and I followed the police car to the precinct.

"Q. Did you go on to the hospital? A. I think I went to the hospital from the precinct.

"Q. Did you do anything at the hospital that night? A. No, sir. I had given the Officer Bailey on my prescription blank a statement that 'This is to certify that I have examined Mrs. Kathryn Jillson and I believe that she is mentally ill and in need of hospitalization,' and I signed my name and I told Officer Bailey to submit this at the hospital."

Officer Bailey testified "the doctor said that in most cases it took the certificate of two doctors and affidavits of two disinterested persons to take someone out of the house, but in this particular case he would not be responsible for what might happen."

The day after appellant's arrest the District Court, on petition of the police, committed her to Gallinger Hospital for examination by the Mental Health Commission. The court discharged her ten days later, the Commission having found her to be "now of sound mind." Commission members who examined her shortly after she was committed are said to have thought her mentally ill then.

The District Court directed a verdict for appellee at the close of appellant's case. We think this was error.

 The complaint charges false imprisonment. The evidence would have supported and, in the absence of opposing evidence, required a jury's finding that appellee advised, requested, or "directed," and thereby caused, the police to arrest appellant as an insane person. In that case he is liable for her arrest, and for her imprisonment until she was committed by the court. Not only the perpetrator but the instigator of unlawful violence is fully responsible to its victim. A request or advice, express or implied, that is effective in fact is effective in law; neither command nor authority is necessary.

 Congress has provided legal proceedings to determine, with the aid of a Commission on Mental Health, whether "any alleged insane person" in the District of Columbia requires hospitalization. D.C. Code (1940) §§ 21—308 to 21—316. Congress has permitted the arrest of alleged insane persons without such proceedings in only two sorts of circumstances, both absent here. Section 21—326 of the Code authorizes the police to arrest without warrant "any insane person or person of unsound mind" found in a street or other public place. Section 21—327 authorizes the superintendent of police to order the arrest without warrant of an "alleged insane person of homicidal or otherwise dangerous tendencies," though not found in a public place, if "two or more responsible residents" make affidavits to their belief that for specified reasons the person is unfit to be at large; *Provided, however,* That before the * * * superintendent * * * shall order the apprehension * * * of any person upon the affidavits * * * he shall, in addition thereto, require the certificate of at least two physicians who shall certify that they have examined the person alleged to be insane or of unsound mind, and that such person should not be allowed to remain at liberty and go unrestrained, and that such person is a fit subject for treatment on account of his or her mental condition." The statute thus forbids the superintendent of police, and by plain implication everyone else, to cause the arrest of an "alleged insane person of homicidal or otherwise dangerous tendencies" on the advice of one physician. A policeman may not make without the superintendent's order an arrest which he may not make with it.

In providing protection for persons whose relatives think or pretend to think they require restraint because of mental ill-

ness, Congress necessarily struck a balance between individual liberty and public safety. A policeman or a psychiatrist may think Congress should have drawn the line in a different place but may not make arrests on that theory. Some insane and some sane persons may well be thought dangerous, but even the most reasonable belief that they will do harm in the future does not justify doctor or layman in arresting them without statutory authorization and without a warrant. Appellee's calling neither defeats appellant's claim to damages nor reduces its amount.

Reversed and remanded.

WASHINGTON, Circuit Judge (concurring).

I think that the evidence recited in the opinion of this court was sufficient, under the view I take of the applicable law, to require the submission of the case to the jury, and that the judgment of the District Court should accordingly be reversed.

I agree with much that is said in this court's opinion. That opinion, however, appears to me to impose too broad a measure of liability in cases of this sort. The statute here involved, regulating detention of insane persons, is relatively detailed. Certificates of two physicians, affidavits of two responsible residents, action by the head of the police department of the District—all are called for. D.C.Code, § 21—327 (1940 ed.). Without doubt these provisions are desirable and normally workable. But the Congress could hardly have intended that every failure to comply with the requirements of the statute—even the most minute—should ground an action for damages, possibly in a very large amount, against every person connected with the incident, including a physician acting in good faith.

The statute makes no mention of civil liability. I cannot believe that the effect of the act is to impose full liability for every deviation from the prescribed procedure, regardless of the exigencies of the occasion and the possibility that the action taken was in fact beneficial to the patient. Nor do I believe that such a result should be inferred, absent an express congressional directive. "The common law recognized the power to restrain, summarily and without court process, an insane person who was dangerous at the moment. The power was to be exercised, however, only when 'necessary to prevent the party from doing some immediate injury either to himself or others' (Anderdon v. Burrows, 4 Car. & P. 210, 213, 172 Eng. Reprint 674, 675) and 'only when the urgency of the case demands immediate intervention.'" Warner v. State, 297 N.Y. 395, 79 N.E.2d 459, 462–463. The New York courts have held that this rule is still the law in that State, and co-exists with statutory provisions rather similar to those under discussion here. Warner v. State, supra, citing with approval Emmerich v. Thorley, 35 App.Div. 452, 54 N.Y.S. 791. I would apply that rule in this jurisdiction, while stressing that the defendant must plead and prove that the emergency was real and immediate, and that the measures taken were reasonable under all the circumstances. Thus, in the instant case the questions for the jury to decide would be whether defendant had counseled or aided an arrest which did not comply with the statutory procedure, and, if the answer be in the affirmative, whether such an emergency existed as to require that action. I would further permit a defendant to prove in reduction of damages that he was acting in good faith, that the patient was in fact in need of hospitalization, and that the hospitalization was beneficial. See Warner v. State, supra, 79 N.E.2d at page 464.

The views just expressed would in my judgment take cognizance of the practicalities of the situation, without denying proper effect to the statutory provisions. Were hospitalization a punitive measure, there would be basis for attributing to Congress an intent to impose broad liability in damages for every departure from the statutory procedures. But as it is curative and protective, it seems unlikely that the Congress intended to penalize action when a physi-

cian in good faith finds a real emergency to exist and where he shows himself to have been correct in that belief.

The liberty of the individual must, of course, be fully protected. I believe that the measure of liability outlined above will give that protection, and at the same time not place an undue burden on the physician.

Professional men should be required to conform to the high standards of their calling, both as to care and skill, and as to ethics. But we should take care not to penalize them for assuming the responsibility and taking the action which membership in their profession and the welfare of the community require.