## ORVIS v. BRICKMAN et al.

### No. 10987.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 2, 1952.

Decided March 6, 1952.

Benjamin H. Dorsey and Irving G. Mc-Cann, Washington, D. C., with whom Smith W. Brookhart, Washington, D. C., was on the brief, for appellant.

Chester H. Gray, Principal Asst. Corporation Counsel for the District of Columbia, Washington, D. C., with whom Vernon E. West, Corporation Counsel, Oliver Gasch, Asst. Corporation Counsel, and John F. Doyle, Asst. Corporation Counsel, Washington, D. C., were on the brief, for appellees Jacob Brickman, Dr. Alvin R. Sweeney, and Dr. Joseph L. Gilbert. H. Mason Welch, Washington, D. C., was on the brief for appellees Dr. Joseph L. Gilbert and Dr. Alvin R. Sweeney.

Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty. at the time the brief was filed, Washington, D. C., was on the brief, for appellees Dr. Zigmond H. Lebensohn, Dr. Robert T. Morse, and Thomas Gillespie Walsh. Charles M. Irelan, U. S. Atty. at the time of argument, Washington, D. C., also entered an appearance for appellees Dr. Zigmond H. Lebensohn, Dr. Robert T. Morse, and Thomas Gillespie Walsh.

Before PRETTYMAN, PROCTOR and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is an appeal from a judgment and two orders in a civil action for false imprisonment.

Early on the morning of December 29, 1947, appellant cut her right wrist with a razor blade. According to her statements she was attempting to pare a callus on her foot. The blood came freely and in spurts, indicating that an artery had been cut. Some forty or fifty minutes later she called a superior at her office and told him that she would be unable to come to work that day and requested that he report her as being sick. As her voice seemed to be somewhat hoarse and indistinct, he inquired

whether she had a bad cold. She then told him that she had cut her wrist. He asked whether she had called a doctor or whether someone was attending the cut for her, and, receiving negative answers, he found out where the key to the house was and told appellant he would get help to her. Thereupon he called a hospital, and the hospital sent an ambulance. A police radio call for a scout car was put out, giving the address and saying "an attempted suicide". Officer Brickman and his partner responded. Upon the officers' arrival at the given address, one of the ambulance attendants told Officer Brickman that they had called the police because there was a woman bleeding to death and she had refused treatment. The officer went up to the room where appellant was. The scene was described by a neighbor, a friend of appellant, who had the key to the house. She said that there was a good deal of blood on the bed, that the blankets were full of blood, and that the bathroom, including the washbowl, was full of blood. This neighbor said, "I don't see how anybody could lose much more and still live." Officer Brickman and the ambulance attendants succeeded, with a great deal of difficulty, in stopping the flow of blood. Tourniquets were ineffective, and pressure pads were finally used. During this time appellant was alternately conscious and unconscious. Officer Brickman asked her a few questions. He testified that she said she had cut her wrist when the razor blade slipped while she was cutting a callus, but that she added something to the effect that she was glad it had happened and that it would have been better if the officers had not come. He looked at her feet, but as far as he could see there was no callus there. There was a discussion as to how appellant would be taken down the steps, as she was a heavy woman, weighing about 250 pounds. She suggested that maybe she could walk down. An ambulance attendant took her arm, and she took a few steps but fainted. Thereupon they took her downstairs and into the ambulance on a stretcher. She testified that she tried to be helpful to those who were helping her. Officer Brickman directed the ambulance attendants to take her to Gallinger Hospital. She testified that she asked to be taken to Sibley Hospital, where she had Group Hospitalization. But the officer was familiar with the arrangements at Sibley and was of the opinion that that hospital was not equipped for emergency service; he said that on the occasions when he had been there there were no doctors in attendance in the one room available for such service, only one nurse being on duty. The ambulance took appellant to Gallinger Hospital.

Officer Brickman did not accompany the ambulance but returned to his precinct. There he reported the incident to his commanding officer and made out what is called a "white slip". This paper is a Police Department form and was to be sent to Gallinger Hospital. Officer Brickman wrote on the form: "About 8:30 a. m., Monday, December 29, 1947, Sally Orvis, white, 58 years, slashed her right wrist with a razor blade. She stated she had done it while cutting callouses on her feet, but that she was satisfied it had happened. Examination of her feet showed no signs of cut callouses. Razor blade recovered. Pvt. Jacob Brickman, No. 12 Precinct." On the reverse side of the paper the captain of the precinct filled in the form, which read in part: "The admission of Sally Orvis to the Gallinger Municipal Hospital is requested for observation and report as to her mental status." This slip was forthwith sent to Gallinger Hospital and made a part of its "admission record". Officer Brickman then made an entry on the police blotter, in which he reported the incident under the heading "Attempted suicide", otherwise using about the same language which he had used on the "white slip". The log of the Radio Division of the Police Department shows: "8:40 a. m. Scout No. 121, time reported cleared 9:30. Location 223 Channing, Northeast, complaint attempted suicide. Remarks, report." Officer Brickman then called Mr. Eugene Orvis, a cousin of appellant, and, as he was not in his office, left word for him to call the officer. Under instructions from his captain and pursuant to police regulations, the officer then went to the office of the Commission on

Mental Health and reported the incident to the executive secretary, who prepared a petition to the court. The key paragraph of that petition read:

"2. That Sally Orvis was apprehended in the District of Columbia on the 29th day of December, 1947, and has been detained at Gallinger Hospital, to be observed and examined for his/her mental health for the reason that;

"Sally Orvis slashed her wrist, right wrist, with a razor blade in an attempt to end her life. She would not give any explanation for her actions or attempt to stop the bleeding of her wrist. Because of her actions, it thought best to admit her to Gallinger Municipal Hospital for mental observation."

Officer Brickman signed and swore to the petition, and it was promptly transmitted to the District Court. A judge of that court thereupon ordered that a writ issue requiring the patient to appear before the Mental Health Commission, that the petition be referred to the Commission for a report, and that the patient meantime be detained in Gallinger Hospital. That order was sent to the Hospital in the late afternoon of that same day.

Meantime appellant, upon her arrival at Gallinger Hospital, was sent to an operating room, and in an operation which apparently lasted about an hour her wound was treated. She was then taken to the "psychiatric ward" in the Hospital. She testified that her first really conscious moment was when her supper was brought to her that evening. Her cousin, Mr. Eugene Orvis, had responded to the call from Officer Brickman, had ascertained from the precinct headquarters the facts of the matter, and had phoned a Dr. Geller, who reported to him that the wound had been treated, that there was no cause for alarm, and that he had talked to the patient as to the circumstances of the accident. Mr. Orvis went to the Hospital about two-fifteen that afternoon and talked to the appellant. A Dr. Malone, the assistant in the psychiatric ward, told him that the record in the Hospital showed the patient as sent in by the police for attempting suicide. Mr. Orvis advised both of these doctors that he was sure there was no basis which would justify any suspicion whatever of attempted suicide. Mr. Orvis attempted to get in touch by telephone with Dr. Gilbert, the head of the psychiatric department of the Hospital. Two days later, on December 31st, he talked to Dr. Gilbert. He also interested Congressman Plumley in the matter.

On December 30th, the day after the court had referred the petition to the Mental Health Commission, the Commission made a "Preliminary Report" to the court, stating that the appellant had been examined and found not to be sane and recommending that the matter be set down for hearing. The court ordered a hearing on January 8, 1948. The hearing was thus set. On January 3rd appellant was examined by Dr. Gilbert and was released from the Hospital by authority of Dr. Sweeney, Superintendent. A memorandum to the Mental Health Commission, dated January 3rd, informed the Commission that she had been discharged as of sound mind. The District Court, being advised of the discharge, dismissed the petition.

A general order in the Metropolitan Police Department provides in part as follows: " * * * or, again, there is a situation where a person is attempting suicide, or has attempted suicide, and is in need of medical attention immediately, the question the officer must answer is, what would a reasonable and prudent man do in these circumstances? The officer should act for the welfare of the patient; * * *."

A year after the foregoing events appellant filed a civil action for false imprisonment, naming as defendants Officer Brickman, the three members of the Mental Health Commission, Dr. Sweeney, and Dr. Gilbert. Upon motion the court dismissed the complaint as to the members of the Mental Health Commission. Also upon motion the court rendered summary judgment in favor of the two doctors. Trial was had upon the complaint against the police officer, and at the conclusion of the appellant's case the court directed a verdict in favor of the defendant officer.

The case, as it is here upon appeal, is in three parts.

■ 1. *Dismissal of the complaint as to the members of the Mental Health Commission.* In this aspect of the case appellant encounters the immunity which surrounds public officials in the performance of acts within the scope of their official duties.[1] That immunity is broad, deep and strong. To succeed here, appellant would have to carve out of that protected area an exception. However, we do not reach that problem upon the present record. The claim of the complaint, fortified by appellant's affidavit, is that the members of the Mental Health Commission falsely stated in the "Preliminary Report" that they had examined her. The Preliminary Report was not the statutory report of the Commission required to be made after examination and hearing and to contain a final recommendation to the court.[2] The sole use of the Preliminary Report was to secure an extension of the statutory period of seven days within which the Commission must hold its hearing and formulate its recommendation to the court; only the court could make that extension. As a result of the Preliminary Report in the present case, the court extended the seven days to ten days and set the hearing before the Commission for January 8th. But appellant was released on January 3rd, before the expiration of the seven days. The Mental Health Commission had no part in the initial placing of appellant in the Hospital, or in placing her in the psychiatric ward, or in the court order which would have detained her for seven days; its Preliminary Report had no effect whatever upon the situation. The complaint thus stated no claim upon which relief could, under any theory, have been granted

against the members of the Commission. Hence, the complaint was properly dismissed as to them.

■ 2. *Summary judgment as to the doctors.* In affidavits filed in support of their motion for summary judgment, Dr. Sweeney and Dr. Gilbert each asserted that he was not aware of the presence of appellant at the Hospital until some time after the receipt of the order of the court. Dr. Sweeney said that he did not know that she was there until January 3rd, when he signed the memorandum of discharge. Dr. Gilbert said that the initial examinations were not made by him and that his examinations were made after December 30th.

Appellant contends that under Zinkhan v. District of Columbia [3] Dr. Sweeney and Dr. Gilbert would be liable if they knew of her detention prior to receipt of the court order of commitment. In response to that contention we first observe that the statute requires the Gallinger authorities to detain persons arrested for mental observation until the filing of the petition to the court by the police officer,[4] and we think common sense and public necessity require the same interim detention of a person already properly in their care and in need of mental examination. Therefore, as a matter of law, under the circumstances of this case, the doctors were not civilly liable for the interim detention of appellant prior to receipt of the court order.

The District Court pointed out that at no time did appellant assert any fact contradictory to the affidavits of the doctors. Her contention was that she had a right to cross-examine the doctors, even though she could make no assertion of fact to contradict them. The motion for summary judgment was made more than two years

1. Taylor v. McGrath, 1952, 90 U.S.App. D.C., ——, 194 F.2d 883; Cooper v. O'Connor, 1938, 69 App.D.C. 100, 99 F.2d 135, certiorari denied, 1938, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414; Laughlin v. Rosenman, 1947, 82 U.S.App. D.C. 164, 163 F.2d 838; Fletcher v. McMahon, 1941, 73 App.D.C. 263, 121 F.2d 729, certiorari denied, 1941, 314 U.S. 662, 62 S.Ct. 131, 86 L.Ed. 531; Gregoire v. Biddle, 2 Cir., 1949, 177 F.2d 579, certiorari denied, 1950, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363; Gibson v. Reynolds, 8 Cir., 1949, 172 F.2d 95, certiorari denied, 1949, 337 U.S. 925, 69 S.Ct. 1170, 93 L.Ed. 1733. Cf. Colpoys v. Gates, 1941, 73 App.D.C. 193, 118 F.2d 16.

2. D.C.Code § 21-311 (1940).

3. 1921, 50 App.D.C. 312, 271 F. 542.

4. D.C.Code § 21-311 (1940).

after the suit was filed, but the appellant had made no effort to examine the doctors under the discovery rules.

We think the court was well within the rule which provides that summary judgment may be entered if there is no genuine issue of a material fact.

■ 3. *The directed verdict as to Officer Brickman.* The officer did not "arrest or apprehend" the appellant at her home, within the meaning of those terms as they are used in the statutes. Appellant does not complain about having been taken from her home. As a matter of fact, her testimony was that she cooperated in her removal from her home. She was taken from her home under the direction of the officer lest she should bleed to death. To denominate this removal as an illegal arrest or apprehension would be contrary to the public interest and to the interests of the persons involved, contrary to law, and dramatically contrary to common sense.

Appellant has no legitimate complaint at being taken to Gallinger Hospital. This is a hospital, not an asylum. The officer knew that Gallinger had, and believed that Sibley did not have, adequate emergency facilities. Appellant was at that time in desperate need of emergency surgical attention.

Appellant has no legitimate complaint at being kept in a hospital for several days. She was alternately conscious and unconscious. She had lost so much blood that she could not walk or stand up. Her detention, if it could be called that, in the Hospital for several days was not a matter for complaint but was entirely for her benefit.

The gist of her complaint is that she was put in the "psychiatric ward" instead of in a surgical ward. She was put in that ward in order that she might be given mental observation. The reason that she was to be given mental observation was because someone involved in the incident was of the view that she had attempted suicide. Although it is apparent on the record that Officer Brickman was of the opinion that the appellant had attempted suicide, a careful examination of the events does not disclose that he was responsible for the ini-

tial action of the medical authorities at Gallinger in putting the appellant in the psychiatric ward. Officer Brickman, so far as the record shows, did not go to Gallinger Hospital. Appellant was taken to Gallinger by the same ambulance attendants who had called for police assistance in "an attempted suicide" case and had told Officer Brickman that the appellant would not cooperate in the effort to stop the flow of blood. When Mr. Orvis went to the Hospital at two-fifteen that afternoon, Dr. Malone, who was the assistant physician in the psychiatric ward, showed him that the record of the Hospital was "attempted suicide". The "white slip", made out in part by Officer Brickman and in part by his commanding officer, made no mention of attempted suicide. We have quoted it in full, in so far as Private Brickman composed it. He said that she had slashed her wrist with a razor blade, that she said she had done it while cutting calluses on her feet but was satisfied that it had happened, and that her feet showed no signs of cut calluses. If the use of the "white slip" and its "charge of unsound mind" is to be attributed to Officer Brickman, nevertheless it is perfectly apparent from the facts which we have recited that he was well within the permissible bounds of reasonable judgment when he formed the opinion that the appellant had attempted suicide. We think that upon the evidence before him he was amply justified in the view which he took. Moreover, it seems to us that the police regulation which requires an officer, in dealing with an attempted suicide, to do what a prudent man would do in the interests of the patient, is a valid and proper rule. We think that the police practice of requesting a mental examination of a person who has attempted suicide is a proper practice. Thus we think that under the circumstances of this case a properly conducted mental observation of this appellant was amply justified.

Appellant earnestly contends that the statute authorizes the arrest and confinement of alleged insane persons in two situations only: (1) Where an alleged insane person is "found" in a public place

an officer may make an arrest and petition the court to commit the person arrested to Gallinger Hospital for mental observation;[5] and (2) where an alleged insane person is found "elsewhere", *i. e.*, not in a public place, an officer may make an arrest upon the affidavits of two responsible residents and two qualified physicians.[6] But, as we have pointed out, appellant was detained for mental observation only after she had been taken to the Hospital for necessary emergency medical treatment. Up to the point where the surgery was complete nothing had been done without her willing cooperation and in her imperative best interest, unless we are to give legal effect to her claimed mention of Sibley as her choice of a hospital. Certainly a person picked up by an ambulance in an accident is not "arrested" if he is taken to one hospital instead of another. We need not go into the technicalities of "arrest" or "apprehension". Whatever the technicalities, in the present case the seizure, or taking into custody, or detention, which might constitute an arrest or apprehension occurred at the point of time and place when she was taken to the psychiatric ward. She was then in a public place, the Gallinger Municipal Hospital.

Even if this were not so, we could not find that Congress, in enacting these provisions of the statute, intended to supersede the common law power of emergency arrest to such an extent as to impose civil liability upon a person who, acting reasonably, detains or restrains a person temporarily, for the purpose of mental observation, in order to prevent immediate serious harm or injury to the person restrained or to others.[7]

We hold that a verdict was properly directed in the circumstances of this case, on the basis that no reasonable person could conclude, at the close of the plaintiff's evidence, that Officer Brickman did not act properly and to meet a real and immediate emergency.

In view of all that has been said in this case, we are constrained to observe that in our opinion Officer Brickman acted with commendable decision and in a manner consistent with the highest standards of police action. Had he hesitated over some technicalities of legal proceedings before getting this appellant off to a hospital which he knew was equipped for emergency service, appellant would have been dead and he would have been subject to emphatic censure.

There is, of course, in cases of this sort a point of balance between the requirements of the person involved if he is in fact of unsound mind, and the interests of that person if he be of sound mind; and there is also a point of balance in the public interest in the proper treatment of insane persons and the proper protection of sane persons against commitment for insanity. The precise balance is difficult in many cases.[8] The present record does not show the precise nature of the mental examination given this appellant at the hospital before she was placed in this particular ward, but it does direct attention to the need for care in this respect. Whatever the details may be in this particular case, this litigation should serve to call to the attention of the authorities the urgency of an adequate preliminary mental examination before hospital patients are placed in a ward occupied, in part at least, by the mentally deranged.

Appellant's most insistent point as to Officer Brickman is that she was detained in the psychiatric ward because the officer "lied" when he failed to tell the court in his petition that he had "apprehended" appellant in her home. She is apparently of the view that, had the court known that the officer removed her from her home, the court would not have signed an order for her detention at Gallinger. But that con-

5. D.C.Code § 21–326 (1940).

6. D.C.Code § 21–327 (1940).

7. See Jillson v. Caprio, 1950, 86 U.S.App. D.C. 168, 170–171, 181 F.2d 523, 525–

526 (concurring opinion); Warner v. State, 1948, 297 N.Y. 395, 401, 79 N.E.2d 459, 462–463.

8. See Note on Jillson v. Caprio, 35 Cornell L.Q. 904 (1950).

clusion would not have followed a complete revelation of the facts of appellant's removal from her home. She was not arrested or apprehended in her home as an insane person. She was moved in order to save her life. She was properly in a hospital. At that point, the patient being not only properly but of necessity in the hands of medical authorities at a hospital, the sole question was whether she should have a mental examination. The fact that she had been removed from her home instead of having been picked up in a public place, under the circumstances in this record, was wholly immaterial to the question whether, being properly in the hospital, she should or should not have a mental examination. The claim of a *nunc pro tunc* illegal arrest at her home is devoid of merit, either factual or legal. The doctrine of Jillson v. Caprio,[9] in which case there was no imminent danger, has no application whatever in the present case.

The judgment and orders of the District Court are affirmed.

9. 1950, 86 U.S.App.D.C. 168, 181 F.2d 523.