CASTLEGATE, INC., a corporation, Plaintiff,

v.

NATIONAL TEA COMPANY, a corporation, National Dairy Products Corporation, a corporation, N. L. Chaplicki, and Forrest B. Woolman, Defendants.

Civ. A. No. 6721.

United States District Court
D. Colorado.

Sept. 19, 1963.

Robert T. Kingsley, Denver, Colo., Jeremiah Murphy, Sioux Falls, S. D., and Arent, Fox, Kintner, Plotkin & Kahn, Sidney Harris, Washington, D. C., for plaintiff.

Frederic L. Kirgis, Gorsuch, Kirgis, Campbell, Walker & Grover, Ira Quiat, Quiat, Seeman, Quiat & Woods, Denver, Colo., James E. Hastings, Chadwell, Keck, Kayser, Ruggles & McLaren, and Max Wildman, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for defendants.

DOYLE, District Judge.

This matter is before the Court on defendants' motion to dismiss for failure to prosecute, their motion for summary judgment, and also on the motion of the plaintiff for leave to file its tendered amended complaint.

The action is brought under the federal antitrust statutes. The original complaint was filed October 29, 1959, in the United States District Court for the District of South Dakota. On March 7, 1960, the cause was transferred from the District of South Dakota to this district and thereafter, on July 15, 1960, a preliminary pre-trial conference was held. At that time discovery was frozen until the further order of the court and on October 6, 1960, another conference was held and at this time a stipulation was entered into interpreting and construing the allegations of the original complaint and setting forth the nature of the claims. It was there agreed that Count I charged a combination in violation of Section 1 of the Sherman Act. Count II charged a more specific violation of Section 1 of the Sherman Act and a further agreement was that Count III sought relief solely against the defendant National Tea, based upon its acquisition of the capital stock of Miller's Markets, contrary to Section 7 of the Clayton Act. At the time that this stipulation was completed the discovery restrictions which had been imposed by the court were lifted. During the ensuing twelve-month period the only activity in the case consisted in the filing by defendants of motions to sever and in the filing by plaintiff of motions to pro-

duce documents supported by briefs and affidavits.

On September 7, 1961, Judge Chilson, to whom the case had been assigned, requested that it be reassigned, and following this re-assignment to the undersigned the matter was set for pre-trial conference on November 2, 1961.

After this preliminary pre-trial conference a deadline for the completion of discovery and for a pre-trial conference was fixed. At that time plaintiff was ordered to make specific preparation for this pre-trial conference. This discovery deadline was extended beyond May 7, 1962 on three subsequent occasions, and thereafter depositions were taken by both parties. Following this, and on February 18, 1963, plaintiff sought leave to tender an amended complaint, that which is now before the court but with respect to which leave to file has not been granted.

On April 1, 1963, the plaintiff filed a "trial brief" in accordance with a previous court direction. One basis for the motion to dismiss is inadequacy of this trial brief, it being claimed by defendants that plaintiff has failed to comply with the court order.

Since April 1, 1963, there have been several hearings dealing with the adequacy of the plaintiff's effort to make a positive showing and the present motions are a culmination of these several hearings. Original briefs, answer briefs, reply briefs have been filed, and at this point the parties are engaged in a letter-writing contest of charge and countercharge.

The original complaint alleged that National Dairy, acting through its subsidiary, Kraft, together with National Tea and Miller's Supermarkets, engaged in a conspiracy and acted in concert for the purpose of forcing plaintiff out of the food-processing business. The specific acts alleged are that Kraft gave Miller unreasonable advertising and promotional allowances; that Kraft products monopolized the shelves of Miller stores; that Kraft sold to Miller at prices below man-ufacturing costs. It is alleged that these discriminatory practices were offered to Miller to the exclusion of other retail grocers in the area.

It is further claimed that National Tea became a part of this conspiracy when it acquired the stock of the Miller chain in the summer of 1957 and that this acquisition violated Section 7 of the Clayton Act.

The amended complaint which is now being tendered is similar to the original complaint. It alleges substantially the same factual matter, but emphasizes substantive violations of the Clayton Act, as amended, and does not limit its demands to conspiracy in accordance with the stipulation entered October 7, 1960.

The foregoing sets forth only the highlights of the litigation and falls short of being a detailed history. It, however, will be sufficient (with some additions applicable to particular issues which will be herein discussed) to permit the disposition of the matters which are now before the Court.

## I.

## THE MOTION TO DISMISS

■■ Rule 41(b) empowers the court to dismiss an action for failure of the plaintiff to prosecute or for failure to comply with the rules or of any order of court. The court has a discretion which must be exercised in relation to the history of the case and the situation at the time of dismissal. 5 Moore's Federal Practice 1036; Sandee Manufacturing Co. v. Rohm & Haas Co., (7 Cir. 1962) 298 F.2d 41. Defendants' argument is that the plaintiff has violated everything in the book, so to speak, including failure to complete discovery in accordance with court schedules, failure to meet pre-trial deadlines, and particularly failure to file a trial brief in accordance with the court's order.

It is to be noted that the case is an antitrust action which was treated from the outset as protracted litigation requir-

ing very extensive discovery on both sides but particularly by plaintiff. Also noteworthy is the fact that both the court and counsel expected more in the way of tangible evidence than plaintiff has been able to produce; thus, the posture of the case at present from the standpoint of plaintiff's ability to prove its charges, is not substantially different from that which was apparent approximately two years ago when it was assigned to this court. The important difference is that the facts and the law are somewhat better organized and whereas originally it was believed by plaintiff that the case was primarily a Sherman Act case, it would now appear that the emphasis has changed so that the main thrust of the evidence is directed toward substantive price discriminations allegedly violative of Section 2 of the Clayton Act, so that the conspiracy aspect would now appear to be secondary.

Although there has been a failure to vigorously prosecute the case, it would not appear to stem from a deliberate dilatory course of conduct, such as was present in Shotkin v. Westinghouse Electric & Mfg. Co. (10 Cir., 1948), 169 F.2d 825. There the Court of Appeals noted that the plaintiff had filed numerous baseless motions and had engaged in tactics showing a studied purpose to drag the case along without trial. In Link v. Wabash Railroad Company, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734, the Supreme Court recognized that the trial court has a discretion to dismiss pursuant to Rule 41(b) where a plaintiff's lawyer failed to appear at a pre-trial conference. It was made clear by the Supreme Court however, that the discretion is controlled and that the dismissal must be viewed in relation to other evidence bearing on whether the failure to attend the conference was deliberate or negligent. There the failure was neither deliberate nor negligent. On the other hand, in the present case it is not to be concluded that the plaintiff or its counsel acted intentionally or negligently. Here there were efforts made to comply with the court's directions and the delays and failures were the result of inability to produce in accordance with the court orders or, in one instance, to the illness of counsel. The failure to appear at a scheduled pre-trial was due to misapprehension. Plaintiff's counsel had believed that this setting had been vacated since the deadline for filing the pre-trial brief had been extended.

From the circumstances outlined, the court could not justify, at least at this juncture, dismissal of the case for failure to prosecute. It is also to be noted that there is some hope for the future. It may well be that the plaintiff's proof, when sifted, will be inadequate, but the day of decision is nevertheless foreseeable, and the plaintiff should not at this late date be deprived of an opportunity to prove its case provided it makes every effort from here on out to organize and prepare its evidence in a form which will permit it to be subjected to legal tests. It is.

Ordered that the motion to dismiss under Rule 41(b) be, and the same is hereby denied.

## II.

### THE MOTION TO FILE THE AMENDED COMPLAINT

As stated above, the court is of the opinion that the amended complaint does not introduce any basically new material but rather is a realignment of the old elements and ingredients with somewhat different emphasis. Thus, the matters set forth in the amended complaint relate back to the original filing in which the discrimination charges were asserted. Rule 15(c), Rules of Civil Procedure.

The problem which demands specific attention is that created by the October 7, 1960 stipulation wherein it was "stipulated by and between counsel for the respective parties that plaintiff's complaint presently on file shall be construed in accordance with the following:" The stip-

ulation then went on to define the issues as developed by the complaint as limited to Sherman Act violations, together with a claim under Section 7 of the Clayton Act arising from the acquisition by National Tea Company of the Miller stock. Defendants maintain that this stipulation having been arrived at in connection with a pre-trial conference, is binding so as to preclude the introduction of new issues, that is to say, the price discrimination issues which are charged in the amended complaint. It is said that this constitutes violation of Rule 16—that the stipulation is absolutely binding as to the subsequent course of the action unless modified at the trial to prevent manifest injustice. Rule 16 contemplates an ordinary and not a protracted case. In the latter type of case the court is certainly at liberty to modify the legal issues as the discovery progresses. A different ruling would produce straight jacket-rigidity not in keeping with the spirit of the rules.

A second reason for rejection of defendants' position is that the stipulation is not one of fact, but of law. It was an effort to define and construe the complaint. It is doubtful that it could have been approved upon a basis that it would forever and regardless of change in circumstances, constitute a definition of the issues. It was approved as a delineation of the issues as they were then posed.

*Thirdly*, it is not apparent that the defendants have been misled. The factual transactions which are described in the amended complaint are virtually the same as those which appear in the original complaint, in the Murphy affidavit filed soon after the stipulation was signed, and are the same also as the transactions which are described in the trial brief of plaintiff. Thus, the only surprise which the defendants could properly claim would result from introduction of different legal issues. All litigation stands in the shadow of such a contingency.

What has been said applies equally to the contention that the transactions described in the amended complaint do not relate back to the original complaint. It is clear that there is a chain of relationship from the original complaint to the amended complaint and that it was not broken by the October 6, 1960, stipulation.

It is concluded, therefore, that the plaintiff should be allowed to file the amended complaint, and

It is so ordered.

### III.

### THE MOTION FOR SUMMARY JUDGMENT

Defendants' motion for summary judgment challenges the adequacy of plaintiff's trial brief and in addition declares that: "The pleadings, depositions, stipulations and other matters of record herein, show that there is no genuine issue as to any material fact herein and defendants are entitled to judgment as a matter of law."

Whether the brief fills the bill is no longer the sole issue. At this writing the record has been supplemented by affidavits together with depositions so that it is necessary to examine the file and other records and to do so in the light of the allegations of the amended complaint.

The framework, or setting for this action as it is described in the amended complaint, is one in which the defendants, because of their size, have extensive economic power as compared with plaintiff's relatively small stature and inconsequential economic impact. National Dairies, or Kraft is, according to the allegations, engaged in the type of business plaintiff was engaged in, that is, food processing. National Tea is described as a large chain which is controlled by an even larger chain store, George Weston, Limited. A further factor which is emphasized is the acquisition by National Tea of the Miller stores, which acquisition was completed in the summer of 1957 at which time plaintiff ceased operations. The negotiations leading to this, accord-

ing to the complaint, commenced in 1951, from which allegation an inference, according to plaintiff, should arise that during the 1951–1957 period National Tea was a part of any conspiracy which may be found to have existed between Kraft and Miller's Supermarkets.

Paragraph 26 is somewhat more specific. In that paragraph we are told that Kraft gave Miller and National Tea cooperative advertising allowances which violated Section 2 of the Clayton Act, as amended, together with special promotional sales allowances and premiums in violation of the same sections. It is further alleged that services, allowances (presumably disproportionate) and below-cost sales were made by Kraft to Millers; and that sales were made at greatly reduced prices under the guise of "distress" merchandise invoicing. It is also alleged that such allowances were not extended to other independent retailers for like quantity deliveries to their stores. There is no specific allegation as to particular sales which were made to others showing unequal treatment.

Three specific transactions involving the plaintiff are described. The first of these occurred, according to the allegation in the complaint and the affidavits, in November, 1955. On this date plaintiff offered a promotion on its salad dressing and following initial success of the promotion, Kraft reduced substantially the price of its Miracle Whip to Millers, whereupon Millers offered the Miracle Whip at extremely low prices whereby plaintiff's promotion attempt was thwarted.

Then in December, 1955, Kraft offered a promotion in special dressings in metropolitan Denver and in connection with that offered Italian dressing at a price below its manufacturing cost whereby plaintiff, being unable to offer its competitive produce at a price below cost, was substantially injured.

In April, 1957, plaintiff, according to a further allegation (which is also narrated in the affidavits) in an effort to gain shelf space, offered to the retail trade a promotion on its Mayonnaise. The price was such as would allow it to be offered at a substantial reduction in price and at the same time give the retailers a thirty per cent mark-up. After initial success of this promotion, Kraft substantially reduced its price and did so only in the "home territory" of plaintiff, whereby Millers offered the Kraft products at a sharply reduced price with no mark-up whatsoever, all to the damage of the plaintiff.

There is additional factual material in the affidavit of Professor Meyer L. Burstein. From this it would appear that Kraft's invoices show that many sales were made from Millers to Kraft which were lower than the lowest price category on a relevant price list. According to Burstein many invoices indicated discounts from the lowest price category and were concealed under the guise of free goods and protection against price declines, protection against forthcoming promotional allowances, discount based upon warehousing. There were invoices showing sales below Kraft price lists upon the basis that the merchandise was distress, advertising allowances which were disproportionate as between the large chains and the small retailers. From the evidence apparent in the invoices, Burstein concludes that the relationship between Kraft and Millers was such as to prevent plaintiff from selling its products through the Miller stores and that the acquisition by National Tea permanently foreclosed plaintiff from selling its products in the Miller stores. He further concludes that the consistent and substantial discounts were given so as to induce purchase by Millers of a full line of Kraft products to the detriment of plaintiff and that the specific price reductions on Italian dressing in the fall of 1955 and in 1956 directly affected and damaged the plaintiff; and further, that the reductions on salad bowl products and Miracle Whip directly affected and damaged the plaintiff.

There are other affidavits in the file, including that of Jeremiah D. Murphy, dated December, 1960, and that of Edgar A. Schoen, dated July 25, 1963, but these consist largely of conclusions or merely repeat the above narrative.

There are also deposition admissions such as that of Wright as to non-deviation from regular price lists.

Seemingly, the evidence of sales to retailers other than Millers, at different prices, is left to inference. From the fact that there is little or no deviation from established price lists the Court is asked to conclude that there were several sales and that Miller was invariably given special or preferred treatment.

It would seem from a careful analysis of the tendered facts that plaintiff hopes and expects to establish: *first* of all a combination in restraint of trade; or *secondly,* a monopoly or a combination or conspiracy to monopolize; *third,* discrimination in price between different purchasers of commodities of like grade and quality upon the basis that the effect of the discrimination lessens competition or tends to create a monopoly, or to injure, destroy or prevent competition, with the knowledge of the person favored, in this instance Millers, or National Tea.

Violations of Section 2(c), (d) and (e) of the Clayton Act, as amended, are also charged.

There is, of course, also the alleged unlawful acquisition of Millers, which it is said violates Section 7 of the Clayton Act.

From an analysis of the amended complaint and of the factual material that has been tendered in support of the plaintiff's allegations, it would appear that plaintiff hopes to establish that there have been violations of both Sections 1 and 2 of the Sherman Act, violations of Section 2(a) (c) (d) and (e) of the Robinson-Patman Act; and finally, a violation of Section 7 of the Clayton Act growing out of the alleged unlawful acquisition of the Miller stores by National Tea.

Defendants' position is, of course, that even if we give full weight to the tendered evidence of the plaintiff, nevertheless they are entitled to a summary judgment because of glaring deficiencies in the evidence as applied to specific requirements of the various statutes. Defendants argue that the case is long on exaggerated charges and promises as to what can be proved, but short on actual evidence which will be available to establish these charges and from this it is said that they should not be burdened with a trial. Plaintiff, on the other hand, is certain that there have been violations of the antitrust laws which can be proven at the trial—that the evidence is or will be sufficient to justify submission of the cause to a jury.

From a consideration of the entire file and a careful reading of the briefs and an analysis of the arguments, the Court is of the opinion that a trial cannot be avoided—that in view of the allegations and assurances which are offered in the amended complaint and in the statements in the affidavits the court would not be justified in granting a summary judgment; in other words, the plaintiff must be given an opportunity to prove its case. Nevertheless, there are deficiencies in the proof; problems of proof which should be pointed out, and it may be that certain aspects of the case can be disposed of prior to the trial if the plaintiff hereafter fails to come forward with specific evidence demonstrating its ability to overcome the deficiencies.

The court is mindful of the fact that the amended Rule 56 of the Rules of Civil Procedure requires the person against whom a summary judgment has been filed to advance specific facts to demonstrate the existence of genuine issues of material fact. This amendment was intended to give the court additional power to pierce the formal allegations in the pleadings so as to determine whether the tendered issues are real or imaginary. See 6 Moore's Federal Practice, Special Supplement 1963, pages 10 and 11.

The party against whom a motion for summary judgment is filed is, of course, entitled to the benefit of all favorable inferences which may reasonably arise from the evidence and if after analysis of the evidence and a consideration of the inferences the court entertains a reasonable doubt as to the existence of a genuine issue of fact, that doubt should be resolved against the motion; or, still another test is whether reasonable men might reach different conclusions with respect to the issues of fact. See 6 Moore, supra, 2114. If the party against whom the motion is filed has no countervailing evidence and is unable to show that evidence will be available at the trial, it is not entitled to protection against the motion on the basis of a hope that evidence might develop at the trial. See Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762 (1952).

Thus, it is the trial court's duty to ascertain in the light of applicable law, and viewing the record in a manner favorable to plaintiff, whether there are genuine issues. The burden of showing that there is no such issue is upon the movant and his showing must exclude reasonable doubt. 6 Moore, supra, 2124, and the cases there cited. If the record fails to establish clearly that there is no genuine issue the motion must be denied. Whitaker v. Coleman, 115 F.2d 305 (5 Cir., 1940), where it is said on page 306: "It must appear that there is no substantial evidence * * *, that is, either that the tendered evidence is in its nature too incredible to be accepted by reasonable minds, or that conceding its truth, it is without legal probative force."

## A.

## ALLEGED DISCRIMINATIONS OF THE ROBINSON–PATMAN ACT

A summary of the essential requisites under the Robinson-Patman Act, Section 2(a) is set forth in Oppenheim on Unfair Trade Practices, 1024 (quoting Zorn & Feldman, Business Under the New Price Laws (1937) 62, 73):

"a. Price differences between two or more customers which amount to a discrimination;

"b. A sale involving goods or commodities of like grade and quality;

"c. For use, consumption, or resale within the United States;

"d. In, or sufficiently affecting, interstate commerce.

"e. Specified injurious effects of discrimination on competition:

(1) substantially lessens competition in any line of commerce; or

(2) tends to create a monopoly in any line of commerce; or

(3) injures, destroys or prevents competition:

(a) with the person who grants the discrimination

(b) with any of his customers

(c) with the person who knowingly receives the discrimination

(d) with any of his customers

(e) with the customers of any of them."

These essential elements are also set forth in Rowe, Price Discrimination Under the Robinson-Patman Act (1962), page 45: "* * * (A) consummated contemporaneous sales transactions (B) by the same seller to different purchasers, (C) involve 'commodities' of (D) 'like grade and quality,' and (E) occur 'in commerce.'"

Section 2(a) of the Robinson-Patman Act declares it to be unlawful "for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * *." The requirement that there shall have been contemporaneous sales to different purchasers is a real one and can not be supplied by inference. Thus, in Shaw's, Inc. v. Wilson-Jones Co., (3 Cir.,

1939) 105 F.2d 331, the Court, through Judge Biggs said, at page 333:

"* * * The discrimination in price referred to must be practiced 'between different purchasers'. Therefore at least two purchases must have taken place. The term purchaser means simply one who purchases, a buyer, a vendee. It does not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing. In other words, it does not mean a prospective purchaser, or one who wishes to purchase, as the appellant contends."

See also General Shale Products Corporation v. Struck Const. Co., (6 Cir. 1942) 132 F.2d 425; cert. denied 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148, recognizing the necessity of actual sales; and see Goodman and Son, Inc. v. United Lacquer Mfg. Co., (D.C.D.Mass.1949), 81 F.Supp. 890. The evidence in the case at bar is at this writing insufficient to establish the element of contemporaneous sales by the same seller to different purchasers; the only actual sales which appear are those from Kraft or National Dairy, to Millers. It is argued that Kraft's published price lists show that it was offering goods to the trade at prices different from those which were being extended to Millers; however, the *inference* that discriminatory sales were likely made to other purchasers is not sufficient and it is essential that a seller shall have charged one purchaser a higher price for like goods than he has charged one or more of the purchasers' competitors. See Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196; Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1 (7 Cir., 1949); see also Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L. Ed. 1219.

 So also the problem of establishing that the goods sold were of like grade and quality cannot be left to inference. Plaintiff must establish that the contemporaneous sales were of goods of like grade and quality.

 Turning now to the problem of injurious effect on competition: Here the requirement would seem to be less exacting and an injury to a single competitor may constitute the requisite competitive injury. See H. J. Heinz Co. v. Beech-Nut Life Savers, Inc., (S.D.N.Y. 1960) 181 F.Supp. 452, citing Atlas Building Products Co. v. Diamond Block and Gravel Co., (10 Cir., 1959) 269 F.2d 950. In this latter case the jury was told that if the plaintiff failed to prove by a preponderance of the evidence that the price discrimination, if any, had reasonably possible harmful effects, as outlined in the statute, the verdict must be for the defendant. This instruction was approved by the Court of Appeals. Nevertheless, it cannot be said that price discrimination in and of itself is denounced by the act; it is only price discrimination which produces deleterious consequences which is forbidden. See Balian Ice Cream Co. v. Arden Farms Co., (9 Cir., 1955) 231 F.2d 356. Finally, it is to be generalized that the cited cases show more prolonged and consistent discriminations, rather than the isolated and specific transactions which the plaintiff describes. From this it cannot be said that plaintiff's proof is for that reason insufficient. See Rowe, Price Discrimination Under the Robinson-Patman Act, pages 144–150.

 One other problem should be mentioned and that is that of sufficiency of the evidence to show knowledge of Miller's. Subsection (f) of Section 2 of the Act declares that it is unlawful for any person engaged in commerce knowingly to induce or receive a discrimination in price prohibited by the section. Defendants argue that there is a dearth of evidence to establish that Millers received discriminations or induced the same and had knowledge of the same, or knowledge that it was receiving a discrimination or discriminations. Wheth-

er the plaintiff can establish this requisite knowledge element will depend upon the extent of its success in establishing the discrimination and also upon the strength of the circumstances which would lead a buyer to know that it was the beneficiary of discriminations. It would seem, however, that knowledge can be established by circumstantial evidence and whether these surrounding facts will prove sufficient will depend on the strength of the inferences arising from the transactions themselves. This does not appear to be an insurmountable obstacle.

Plaintiff is also relying on subsections (c), (d) and (e) of Section 2.

Subsection (c) prohibits the paying or the receiving or accepting of anything of value as a commission, brokerage or other compensation, or any allowance or discount thereof except for services rendered. On this, Burstein speaks of advertising and warehouse allowances. The extent to which such allowances were given and whether or not they were given for services actually rendered in connection with the sale or purchase of goods, etc., is the question.

 Subsection (d) prohibits the paying of anything of value for the rendition of services in connection with the processing, handling and sale of products or commodities unless any such payment is on a proportional basis to all customers. This latter element will be a proof problem in the instant case; in other words, the plaintiff must establish that such payments were made to Millers and were not offered on proportionally-equal terms to all of Kraft's customers competing in the distribution of the products or commodities.

Subsection (e) declares that it is unlawful to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity by contracting to furnish services or facilities connected with the processing, handling for sale or offering for sale of such commodities

so purchased upon terms not accorded to all purchasers on proportionally-equal terms. Here again, it would appear necessary to establish sales or transactions other than the Miller transactions; in other words, actual discrimination is necessary. There is some tender of evidence looking to a showing of violation of this subsection; however, there is no evidence to support the allegations that there was discrimination incident to the furnishing, for example, of help in arranging the commodities on the shelves.

Although deficiencies and weaknesses in the plaintiff's case are apparent from the foregoing, the court does not feel that it could at this time justifiably hold that no genuine issues of fact are posed. Plaintiff must however, now come forward with tangible evidence demonstrating its ability to fulfill all requirements of Section 2(a). If between now and the trial it becomes clear that there is a lack of evidence of contemporaneous sales, or if it appears that plaintiff will not be able to establish that the allowances which were given to Miller were disproportionate, these issues will have to be eliminated. Such decisions can await the narrowing of the issues and the making of more specific inquiries.

### B.

### THE ALLEGED VIOLATIONS OF THE SHERMAN ACT

Plaintiff's Sherman Act violation is based upon the evidence which has been briefly outlined above; namely, the specific three incidents, that is, the November, 1955, price reduction of Miracle Whip in the Denver area, the November, 1955, sale of Kraft's Italian Dressing at below cost, and the April, 1957, price reduction on Mayonnaise, together with the alleged discriminatory advertising allowances, the alleged discriminatory warehousing allowances, the alleged favors that were granted to Millers alone, such as the right to return merchandise and the furnishing of help for arranging goods on the shelf. Plaintiff maintains

that there was a combination, or conspiracy as between Kraft and Millers constituting a violation of Section 1 of the Sherman Act as well as the Robinson-Patman violations. It maintains that the conspiracy looked to elimination of the plaintiff as a competitor—that there was concerted action between Kraft and Millers to prevent plaintiff's products from gaining shelf space in the Miller stores.

Reference is made to the so-called Murphy affidavit which charges that plaintiff was prevented from freely competing for the business of Millers and as a consequence suffered a loss of sales and profits requiring it to close its business. It is said that the original parties to the conspiracy were Millers and National Dairy Products Corporation or Kraft, and that the conspiracy was later joined by National Tea Company after it acquired the stock of Millers. It is said that the conspiracy took place between 1954 and 1957—that plaintiff was compelled to cease its operations on August 31, 1957. Specifically, the Murphy affidavit alleges that Kraft, during the entire period in question, gave Millers allowance for advertising which disproportionately favored Millers as compared to other retailers in the same area; that Kraft furnished to Millers both before and after the acquisition of its capital stock of National Tea its own employees for the purpose of servicing and stocking the shelves in Miller's stores which displayed the Kraft products. It is said that such services were not offered to other retailers on an equal basis. It is further charged in the Murphy affidavit that Kraft gave Millers other rebates, allowances and discounts and received in return therefor more desirable display space and the cooperation of Millers in its effort to eliminate competing products from the Miller shelves. Thus, plaintiff seeks to establish the conspiracy by circumstantial evidence, by evidence of an implied conspiracy, or by something in the nature of "conscious parallelism," and would have the court infer the conspiracy to destroy it from the overt acts of Kraft and Millers. Cited are such cases as Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 and Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L. Ed. 1490, and also United States v. Singer Mfg. Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823.

Plaintiff's ability to establish the conspiracy, of course, is in the first instance dependent upon its ability to establish substantive violations of the Robinson-Patman Act. We have not been advised as to whether success in this regard would result in their having shown *per se* violations of Section 1 of the Sherman Act, or whether they would on the other hand be compelled to show unreasonable restraints. See United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; see also Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 and Radiant Burners, Inc. v. Peoples Gas, Light and Coal Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Cf. also Northern Pacific R. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 and Atlantic Heel Co. v. Allied Heel Co., 284 F.2d 879 (1 Cir., 1960). See also Rowe, supra, pp. 44, 45, which recognizes the interplay between Sherman Act and Robinson-Patman Act violations.

While the Court is not at this time granting summary judgment as to Sherman Act violations, the important and difficult problems facing plaintiff are noted.

### C.

### ALLEGED VIOLATION OF SECTION 7 OF CLAYTON ACT

The acquisition of Millers by National Tea in the summer of 1957 resulted, according to the plaintiff, in foreclosing it from at least a potential market. Plaintiff does not maintain that prior to the acquisition it had a free access to Millers, but rather argues that after Millers came under the control of National Tea the lat-

ter sold large quantities of its products to Millers and thereby thwarted any efforts which plaintiff made, and any chance it may have had to obtain shelf space in these retail outlets.

Section 7 of the Act prohibits the acquisition of the stock or assets of another corporation where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition or tend to create a monopoly.

The extent of the plaintiff's burden is described in a decision of the Second Circuit in American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2 Cir., 1958). There it is pointed out that in order to establish a violation there must be: *first,* a definition of a relevant market in which a lessening of competition has probably occurred; and *secondly,* an analysis of the nature and extent of the competition within that market. It is further noted that the proper test for determining the substantiality of the resulting effect on competition in the relevant market is a qualitative one.

It is also to be observed preliminarily that Section 7 requirements are not the same as the criteria for showing existence of monopoly power under Section 2 of the Sherman Act. See United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) and United States v. Bethlehem Steel Corporation, 168 F.Supp. 576 (S.D. N.Y.1958). In the latter decision the judge distinguished between Section 2 of the Sherman Act and Section 7 of the Clayton Act. Under the former, monopoly power means power to control prices or to exclude competition (product market including not only the specific line but also all substitute material), whereas under Section 7 of the Clayton Act the issue is whether there is a reasonable probability of substantial lessening of competition. Under Section 7 there can be a substantial lessening of competition regardless of whether there are reasonably interchangeable substitute products. In one decision the Court explained that Section 7 is intended to cope with monopolistic tendencies in their incipiency—before they have attained effects which would justify a Sherman Act proceeding. See Crown Zellerbach Corp. v. Federal Trade Commission, 296 F.2d 800 (9 Cir. 1961).

Even though the burden of proof in a Section 7 case may well be less exacting than that in the Sherman Act Section 2 case, the burden is nevertheless severe. Plaintiff must establish the following: 1) definition of the relevant market; 2) definition of the line of commerce, and 3) demonstration that there is a reasonable probability that the challenged merger substantially lessened competition or tended to create a monopoly within the relevant market. See United States v. Bethlehem Steel Corp., supra.

### 1. THE RELEVANT LINE OF COMMERCE

Exactly what the line of commerce is in the case at bar has not been suggested by plaintiff and it can only be assumed that plaintiff will contend for a narrow definition, such as Salad Dressings, Special Dressings, Mayonnaise and Peanut Butter. Assuming that such a definition can be accepted, plaintiff would nevertheless have the burden of proving that the National Tea-Miller merger created a reasonable probability that competition in that particular product line was substantially lessened.

### 2. THE DEFINITION OF THE RELEVANT GEOGRAPHIC MARKET

In the Bethlehem Steel case, supra, the court said that the section of the country must be determined with respect to both buyers and sellers—that the determination must be made on the basis of not only where the companies have in the past made sales, but also on the basis of where potentially they could make sales and where buyers could reasonably turn

to them as alternative, substantial sources of supply.

Thus, it is unlikely that the Denver metropolitan area could be regarded as the geographic market since the market for foods such as those in question is nationwide in scope. In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) the relevant geographic market as to the vertical aspect of the merger was held to be national (the entire United States). The reason given was that the area of competition of manufacturers for the opportunity to sell to the Kinney retail outlets was national in its scope. The question is not limited to the right of any individual to compete but rather has to do with the relevant market in which all manufacturers of shoes are able to compete. The Supreme Court said in that case:

"* * * Congress' * * * concern was with the adverse effects of a given merger on competition only in an economically significant 'section' of the country. Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition,* not *competitors,* and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." 370 U.S. at 320, 82 S.Ct. at 1521, 8 L.Ed.2d 510.

In United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the court said that a test of the competitive market is: "not only whether small competitors flourish but also whether consumers are well served. See United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 588, 592 (D.C.S.D.N.Y.1958). '[C]ongressional concern (was) with the protection of *competition,* not *competitors.*'" Citing Brown Shoe Co., supra, 370 U.S. 320, 82 S.Ct. 1521, 8 L.Ed.2d 510. If the relevant market in the case at bar is the entire United States, plaintiff's difficulties in establishing a lessening of competition

resulting from the merger, are compounded and aggravated. It would appear from a reading of the cases that this may have to be the geographic area here.

In addition to the Brown Shoe and Philadelphia National Bank cases, see Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). Even if Denver is held to be the relevant geographic area plaintiff may find it impossible to show that competition was substantially diminished.

### 3. THE REQUIREMENT OF AN ANTI-COMPETITIVE TENDENCY

Discussion of the relevant product line and of the relevant geographic market has given some indication as to difficulties which plaintiff faces in demonstrating that competition has been lessened by the acquisition here in suit. It has been pointed out that Section 7 is concerned with anti-competitive industry structure rather than with anti-competitive intent of specific acts. The Supreme Court in Brown Shoe stated that Section 7 is concerned with the health of competition rather than with the welfare of the individual competitors. As applied to the case at bar this would mean the health of individual competitors in the food processing lines alleged to be or to have been affected by the National Tea-Miller merger would not be the concern. Rather, it would be a question of the state of competition between the food processors who remain able and willing to supply the particular foods here in question. The inquiry would have to be whether there are resultant impediments in the national market which would have the effect of preventing the Denver public from having a choice between a number of different brands and types of foodstuffs offered at competitive prices.

It would appear, therefore, that the plaintiff's contention that the merger produced injury to it is immaterial. Inasmuch as the cases indicate that the act is concerned with the condition of compe-

tition, plaintiff's ability to establish that competition has been adversely affected seems doubtful. See United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (1960); aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

\* \* \*

As in the case of the other alleged violations the plaintiff's evidence must be subjected to careful scrutiny in relation to the specific applicable law. While the court does not feel justified in now foreclosing plaintiff from implementing its showing, plaintiff must now be advised that searching inquiry as to the adequacy of the proof to satisfy the demands of Section 7 must follow. Unless tangible proof is tendered summary judgment is likely to be entered.

The motion for summary judgment is now denied but without prejudice to the rights of the defendants to renew their motions.

Trial of the action shall commence on January 6, 1964 at 9:30 o'clock A.M.

Previous pre-trial efforts have been ineffectual but it may be that such a conference can now at long last prove helpful. In any event, in order to place this case in a trial posture some kind of pre-trial conference must be held. An effort must be made to narrow the issues and to identify and stipulate the documents. Therefore, it is

Ordered that plaintiff file a list of its witnesses together with a summary of the testimony of each witness. It shall do so on or before October 20, 1963. This should be prepared in the light of the court's comments and with a view to satisfying the requirements of the statutes which are here involved. It shall within the same period also file a list of documents on which it intends to rely at the trial. Each document, or group of documents, should be briefly described. Plaintiff shall also formulate and file within the time fixed a list of the issues of fact and law as the plaintiff conceives them.

On or before November 20, 1963, defendants shall file lists including the names of witnesses together with a summary of the testimony of each witness, lists of documents which they intend to offer and shall formulate the issues of fact and law in accordance with the defendants' viewpoints. Some time after the twentieth of November, a further pre-trial conference will be held for the purpose of obtaining stipulations as to undisputed facts, stipulations as to authenticity of documents and agreement insofar as possible as to the issues to be tried. An effort will be made in conjunction with the pre-trial conference to eliminate issues which can not be substantiated.

The summaries of testimony referred to above shall contain facts rather than conclusions of law or fact.